IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KEITH GUINDON, et al.,

                    Plaintiffs,

    v.

PENNY SUE PRITZKER, in her official
capacity as Secretary of the United States
Department of Commerce, et al.,

                    Defendants,
        and

COASTAL CONSERVATION
ASSOCIATION,

           Defendant-Intervenor.

No.    1:13-cv-00988-BJR

**MEMORANDUM OF ENVIRONMENTAL DEFENSE FUND, BILLY ARCHER,
ANDREW CANTRELL, SCOTT HICKMAN, GARY JARVIS, AND THEODORE
STEPHEN TOMENY, JR. AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS**

## I.    INTRODUCTION

The Magnuson-Stevens Fishery Conservation and Management Act ("MSA") imposes

interlocking duties on Defendants in order "to prevent overfishing, to rebuild overfished stocks,

to insure conservation . . . and to realize the full potential of the Nation's fishery resources." 16

U.S.C. § 1801(a)(6).  This case concerns three of the central requirements of the MSA:

- confining fishing mortality within quotas, *id.* §§ 1853(a)(15), 1883(d);

- adhering to a rebuilding plan for an overfished species, *id.* §§ 1851(a)(1) (achieve

  optimum yield), 1802(33)(C) ("optimum" defined as yield that "provides for

  rebuilding"), 1853(a)(1)(A); and

- using the best available science, *id.* § 1851(a)(2).

Defendants violated these provisions when they established recreational fishing measures for

2013, especially authorizing additional fishing after data conceded to be "more accurate and less

1

biased than those produced in past years" showed that the recreational quota had already been exceeded. *See* 78 Fed. Reg. 57,313, 57,314 (Sept. 18, 2013) (final rule).

After many years advocating for conservation of and responsible access to Gulf of Mexico red snapper, amici Environmental Defense Fund ("EDF") and recreational fishermen Billy Archer, Andrew Cantrell, Scott Hickman, Gary Jarvis, and Theodore Stephen Tomeny, Jr. (collectively, "Fishermen Amici") file this brief because Defendants' actions threaten the recovery of red snapper, small businesses that rely on the species, and, if affirmed by this Court, the rebuilding of fisheries around the country.  Sound science and the provisions of the MSA must govern fishery management, and the agency actions challenged by Plaintiffs indicate that Defendants will not follow these guides unless legally compelled to do so.

Amici confine our arguments to issues previously addressed by the parties and concerning which we have special expertise and insight.  After outlining efforts to work with Defendants to improve the Gulf of Mexico reef fish fishery, we explain the significant environmental and economic impacts of Defendants' legal violations and the viable, legal alternatives to Defendants' failed management regime that could lead to material improvement in the fishery.

## II.    AMICI HAVE WORKED FOR YEARS TO FIND SOLUTIONS TO THE CHALLENGES OF GULF OF MEXICO RED SNAPPER MANAGEMENT

### A.  EDF

In the 1990s, EDF identified individual fishing quotas ("IFQs"), a type of catch share, as a promising way to align the conservation and economic interests of Gulf of Mexico red snapper commercial fishermen and others.  Declaration of Heather Paffe ("Paffe Decl.") ¶ 3.  During the decade between 1996 and 2006, EDF worked with fishermen and others to build support for catch share management in the Gulf.  EDF supported academic research on IFQ management in

Gulf fisheries, leading to publications in peer-reviewed journals, and co-wrote with a commercial fisherman a white-paper assessing IFQs for a National Research Council panel charged with making recommendations about IFQ implementation to Congress and Defendants. *Id.*

When Congress authorized the Gulf of Mexico Fishery Management Council ("Council") to develop a profile of an IFQ program for red snapper, an EDF staffer served on the Ad Hoc Red Snapper Advisory Panel that developed it. *Id.* ¶ 4. Based on the advisory panel's work, the Council developed a red snapper IFQ plan that a majority of eligible fishermen voted for in two referenda, 71 Fed. Reg. 67,447, 67,455 (Nov. 22, 2006). Defendants implemented the program in January 2007. *Id.* at 67,447.

Scientists estimate that red snapper has been overfished since the 1960s. Administrative Record ("AR") at 3502. Gulf red snapper was formally declared overfished under the MSA in 2000[1] and is managed under a mandatory rebuilding plan that is extended for the maximum time period and with the minimum allowable probability of success.[2] The red snapper population is in the early stages of rebuilding, AR 4017, though it remains in an overfished condition, AR 4092.

As the Gulf of Mexico red snapper population increased, the recreational sector began to catch more and larger fish and meet their quota faster. Season limits created a short window in which recreational fishermen raced to catch their allotted quota. AR 2328. As Defendants

---

[1] National Marine Fisheries Service, *Status of the Fisheries of the United States* 11 (2001), *available at* http://www.nmfs.noaa.gov/sfa/statusoffisheries/Archives/StatusofFisheriesReportCongress2000.pdf.
[2] Gulf of Mexico Fishery Management Council, *FINAL AMENDMENT 22 TO THE REEF FISH FISHERY MANAGEMENT PLAN* 26 (2004), *available at* http://www.gulfcouncil.org/Beta/GMFMCWeb/downloads/Amend%2022%20Final%2070204.pdf; *see also NRDC v. Daley*, 209 F.3d. 747, 754 (D.C. Cir. 2000) (requiring 50 percent probability of success).

shortened seasons, it became commonplace for the recreational sector to exceed its quota by a large margin even though individual anglers followed the rules.  AR 4017.  *See* Graph below.[3]



As it became clear that shortening fishing seasons simply was not working, EDF began to advocate for alternative management tools such as harvest management tags, commonly used in hunting, or angler management organizations that would devolve the authority and responsibility to control a portion of the recreational quota to a more localized scale.  See AR 2993, 3873, 4616; Paffe Decl. ¶ 5.  In the for-hire sector, consisting of charter and party boats, a modified IFQ program could extend season lengths and keep the recreational sector's quota from being exceeded.  *See* AR 3873; Paffe Decl. ¶ 5.

### B.  Recreational Fishermen Amici

Some recreational fishermen joined in calling for better management, including Fishermen Amici who watched with alarm as Defendants' chosen method of shortening seasons undermined their businesses – selling trips to catch red snapper, the preferred target of many customers, AR 3023-3025, 4599-4606; Declaration of Gary Jarvis ("Jarvis Decl.") ¶ 3.  Under

---

[3] Data found at AR 3524, 5073; Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Br.") at 19.

the current management system, for-hire captains such as Fishermen Amici cannot permit their customers to fish for red snapper *even in state waters* when the federal recreational fishery is closed.  50 C.F.R. § 622.20(a)(1).  Therefore, they are uniquely punished as the federal season shortens.

Fishermen Amici have proposed a variety of management improvements, but have encountered resistance.  *See* AR 3812-3813, 4974; Jarvis Decl. ¶¶ 4-5.  Fishermen Amici anticipate that a ruling for the Plaintiffs in this case would provide additional incentive for Defendants to improve management, resulting in increased accountability, longer seasons and more stability for their small businesses.  *Id.* ¶ 5.

## III.   DEFENDANTS' ILLEGAL ACTIONS HAVE PROFOUND NEGATIVE ENVIRONMENTAL AND ECONOMIC IMPACTS

The provisions of the MSA at issue here stem from successive revisions to the Act that addressed emerging conservation challenges.  The 1976 Act permitted overfishing by defining optimum yield from the fishery as potentially above sustainable limits.  *See* Pub. L. No. 94-265, § 3(18)(B), 90 Stat. 331, 335 (1976).  In 1996, Congress revised the MSA to require that catch remain below the maximum sustainable yield and that Defendants rebuild overfished fisheries.  *See* Pub. L. No. 104-297, § 102(7), 110 Stat. 3559, 3562 (1996); *id.* § 109(e), at 3584-85.  When many fisheries remained overfished despite the more stringent requirements, in 2007 Congress amended the Act again to require fishery management plans ("FMPs" or "plans") to contain quotas, known as annual catch limits ("ACLs"), for most populations of fish.  *See* Pub. L. No. 109-479, § 104(a)(10), 121 Stat. 3575, 3584 (2007); S. Rep. No. 109-229, at 6-7 (2006).

Defendants concede that the Gulf of Mexico red snapper recreational quota is the functional equivalent of the ACL or catch limit for that portion of the fishery, *see* Def. Br at 12 n.13, and the applicable plan must also contain accountability measures to keep fishing within

that limit, 16 U.S.C. § 1853(a)(15).  As developed by Congress over the years, these seemingly technical requirements give force to the central mandate of the MSA:  that managers "prevent overfishing and rebuild overfished stocks."  *Id.* § 1853(a)(1)(A).

In the case of Gulf red snapper, the general provisions are buttressed by MSA section 407(d), which explicitly provides that the governing plan must contain a quota that results in "a prohibition on the retention of fish" after it is reached.  *Id.* § 1883(d)(1).  The Defendants' recreational management measures – despite compliance by individual anglers – result in dramatic overages of that sector's catch limit almost every year, and the 2013 measures are more egregious than usual.  As explained below, rather than prohibit the retention of fish when the quota was met, *see id.*, Defendants authorized continued recreational fishing after the best scientific information available indicated that the recreational catch limit had been exceeded.

### A.  Disregarding the Best Available Scientific Information Threatens the Recovery of Red Snapper

#### 1.  In Contravention of the MSA, Defendants Permitted Additional Recreational Landings After the Best Scientific Information Available Indicated that the Recreational Quota Had Already Been Exceeded

The lack of accurate catch information complicates recreational fisheries management.  *See* Def. Br. at 13.  To address this concern, in 2007 Congress directed Defendants to use the results of a National Research Council study to improve recreational data collection "with a goal of achieving acceptable accuracy and utility for each individual fishery." 16 U.S.C. § 1881(g)(3).

Responding to that statutory command, in 2008 Defendants began implementing the Marine Recreational Information Program ("MRIP").  *See* Def. Br. at 14.  As part of this effort, MRIP's sampling methodology has been improved on the East Coast and in the Gulf of Mexico, including for red snapper.  Managers in the Gulf region, including Defendants' and Council staff, were part of the MRIP implementation process and were well aware of the methodology change.

*See* AR 5003 (June MRIP data "were generated using MRIP's new dockside intercept protocols, established to address sampling biases identified in the Natural Research Council peer review"); Marine Recreational Information Program Implementation Plan 2012-2013 Update, at 5 (Oct. 2012), *available at* http://www.st.nmfs.noaa.gov/Assets/recreational/pdf/2012-13_MRIP_Implementation_Plan_FINAL.pdf (describing "Intercept survey re-design" planned for 2013); *id.* at 16 (noting participation of agency and Council staff); *id.* at 17-18 (specifying plans for Gulf region). According to one manager, "MRIP is now the method [Defendants are] using to monitor landings and ***is considered to be the best scientific information available***. MRIP has slowly been integrated into [Defendants'] recreational data monitoring program and has now replaced [the prior system] completely." AR 4665 (emphasis added). Recognizing MRIP as the best scientific information available follows from Defendants' conclusion that "MRIP is a more scientifically sound method for estimating catch." AR 4714.

In June 2013, a new Gulf of Mexico red snapper stock assessment indicated that Defendants could increase the 2013 quota. AR 4911. With the commercial sector under an individual fishing quota system, distributing the additional quota to commercial fishermen was ministerial. See AR 5073. As a result of the increased quota, Defendants also proposed to add a supplemental recreational fishing season in October – *if* "additional quota is available after the June landings are known." AR 4911 (proposed rule).

Reflecting that proposal, Defendants repeatedly analyzed the potential fall season with the qualification that it would proceed only if the June MRIP data indicated recreational landings were below the new quota. For example, Defendants' regional staff conditioned their recommended season length by noting that "[l]andings data through June will be available by mid-August allowing managers to compare actual landings estimates against projections.

7

*Adjustments to the fall season end date will be necessary at that time*." AR 5004 (emphasis added). Similarly, the Environmental Assessment ("EA") analyzed the impacts of a second recreational season only "*contingent upon there being unused quota available*." AR 4828 (emphasis added); *see also* AR 4787 (describing alternative with same contingency), 4786 ("Because of the possibility of an overage during the June season even under an increased quota, all of the alternatives specify that there must be unused quota available for the season to re-open."), 4830 (analyzed economic impacts "assuming the recreational harvest is restricted to the recreational quota"). Defendants produced these analyses knowing that the improved MRIP sampling methodology was in place, and all of them explicitly provided that the fall season would not proceed unless the MRIP data showed that recreational quota remained available.

Instead, the MRIP data, combined with other reported landings, showed recreational landings of 6.13 million pounds, some 74,000 pounds above even the higher recreational quota. *See* AR 5073; *see also* AR 11,906 ("Heads-Up" email notes fall "opening was always dependent on recreational catch estimates for the current year" but "the most recent catch estimates . . . are unusually high for Alabama and Florida—so high that they would likely preclude a fall season."). Faced with "unexpectedly high" catch levels, AR 5073, agency managers asked their scientists for an explanation, AR 4999.

To examine whether the change in sampling methodology, rather than a true increase in landings, could explain the increase, the scientific team undertook various analyses, including one "done as a means of trying to 'simulate' what we would have gotten in the sample under the old [sampling] design." AR 5000. The simulations attempted to account for sampling at different times of day and in various subregions of the Gulf. AR 5000-5001. Whatever the method the scientists used, they found that "the total estimated catch is still high." AR 5001. In

sum, although the team could not "safely conclude . . . that the change in design had *no* effect," "[t]he simulation runs ***did not provide strong evidence*** that effects related to the change to the new, improved … sampling design could easily explain much of the increase in the red snapper catch estimates from 2012 to 2013."  *Id.* (emphasis added).

Thus Defendants were confronted with a situation in which (1) they knew an improvement to the sampling design had been instituted; (2) they repeatedly asserted that they would only add a second recreational season if the improved system indicated they had quota left over; and (3) their experts' simulations "did not provide strong evidence" that the sampling design had caused the unexpectedly high catch reports.  Nevertheless, without further analysis agency managers asserted that the new MRIP data was "non-comparable" to the 2013 quota, AR 5003, and thus should not be used as previously intended.  Nothing in the record supports this conclusion, except perhaps the experts' conclusion that they could not "safely conclude . . . that the change in design had no effect," AR 5001.  Given the reliance placed on the MRIP data elsewhere in the record, it was unreasonable for Defendants to put them to one side.

Defendants point out that their guidelines implementing National Standard 2 "provide that the Secretary must base his determinations upon information available *at the time of preparation of the FMP or implementing regulations*."  Def. Br. at 33 (emphasis in original). When the final rule opening the second recreational season was prepared, the MRIP data were available and constituted the best scientific information relevant to the issue.  Defendants conceded as much in the Final Rule opening the second recreational season, asserting that "the new MRIP catch estimates are more accurate and less biased than those produced in past years." AR 5073.  There were *no* competing data on June recreational landings – just projections Defendants had made at the outset of the process that the Defendants previously indicated would

be supplanted by the MRIP data.  *See, e.g.,* AR 5004.  Authorizing a second season on this basis

violated National Standard 2, 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.315(a); permitted

retention of fish after the recreational quota was reached in violation of section 407(d),  16

U.S.C. § 1883(d); and was arbitrary and capricious because the underlying record is not

sufficient to conclude that the decision was the product of reasoned decisionmaking, *see Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

### 2. Continued Quota Overages Disrupt Gulf of Mexico Red Snapper Rebuilding

For years, Gulf of Mexico fishermen have endured lower quotas, stricter size limits, and

other measures[4] that, together with improved commercial management, have resulted in a

substantial increase in the Gulf of Mexico red snapper population in recent years, AR 1141.  No

one is more pleased with this rebound than EDF and the Fishermen Amici.  But to suggest that

shorter and shorter recreational seasons leading to persistent, sizable overages are acceptable

since "adequate progress is being made to rebuild the stock," Def. Br. at 32, ignores both the law

and the science.

In addition to the straightforward statutory language cited above, case law in this Circuit

addresses directly analogous facts.  In *NRDC v. Daley*, 209 F.3d. 747, 750 (D.C. Cir. 2000), the

governing FMP and implementing regulations called for managers to "assure" that the quota they

selected would not result in fishing mortality above the rate mandated in the plan.  The D.C.

Circuit struck down a quota with an 18 percent chance of staying below that rate because it did

---

[4] *Gulf of Mexico Red Snapper 2008 Management Measures Frequently Asked Questions* (Mar. 2008),
http://sero.nmfs.noaa.gov/sf/pdfs/FAQ%202008%20red%20snapper%20management%20measures%20032508.pdf.

not provide the requisite "'fairly high level of confidence'" of success, which must be 50 percent or higher.  *Id.* at 754.

In this case, regulations implementing the applicable plan provide that

[w]hen a sector has been closed based on a projection of the quota . . . being reached and ***subsequent data indicate that the quota or ACL was not reached***, [Defendants] . . . may reopen the sector to provide an opportunity for the quota or ACL to be harvested.

50 C.F.R. § 622.8(c) (emphasis added).  Yet Defendants reopened the recreational season after receiving subsequent data indicating that the quota had been ***exceeded***, the exact opposite of what the applicable regulation required.  Here Defendants had a 100, rather than 82, percent chance of allowing too many fish to be landed in violation of the FMP, worse than the "Superman comics Bizarro world" regulation the D.C. Circuit struck down in *NRDC*.  *See* 209 F.3d at 754.

Moreover, the progress Defendants rely on is at risk.  They note that Gulf red snapper "is still considered overfished until stock rebuilding is achieved under the FMP."  Def. Br. at 12.  But red snapper is not just not rebuilt.  It is only now beginning to climb the hill back towards a healthy population size and structure.  AR 3502.

The management decisions at issue in this case have materially increased the risk that recreational overages will stall rebuilding and return Gulf red snapper to overfishing.  The red snapper rebuilding plan complies with the MSA and thus dictates what Defendants must do to comply with it.  See *supra* at 3; *NRDC*, 209 F.3d at 753 (MSA requirements "collapse into" whether Defendants' actions comply with applicable plan and regulations).  The amount of landings that is consistent with that plan, known as the allowable biological catch ("ABC"), is 13.5 million pounds.  AR 4782.  The applicable quota is 11 million pounds.  AR 5073.  Based on the data available today, which will be adjusted upwards based on information yet to be received,

11

total landings equal 14.62 million pounds. The quota and the maximum fishing level that complies with the rebuilding plan have thus been exceeded entirely as a result of overages in the recreational sector. *See* Table below.

**2013 red snapper catch limits and landings (millions of pounds)**

|  | Commercial | Recreational | Total |
|---|---|---|---|
| **Original** |  |  |  |
| ABC[5] |  |  | 8.46 |
| Quota or ACL[6] | 4.315 | 4.145 | 8.46 |
| Landings | 4.315[7] | 6.130[8] | N/A |
| Overage vs. Quota or ACL | 0 | 1.985 | 1.985 |
| **Revised** |  |  |  |
| ABC[9] |  |  | 13.5 |
| Quota or ACL[10] | 5.610 | 5.390 | 11.00 |
| Landings | 5.610[11] | 9.01[12] | 14.62 |
| Overage vs. Quota or ACL | **0** | **3.62** | **3.62** |
| Overage vs. ABC |  |  | **1.12** |

The MSA contains various provisions governing quotas, accountability measures, and rebuilding plans in order to keep fishing within scientifically-mandated limits, especially where a species is overfished, so that backtracking on rebuilding or overfishing does not inadvertently occur despite managers' best efforts. While Defendants seem to suggest that the other provisions of the MSA do not matter so long as overfishing is not occurring and "adequate progress is being made" towards rebuilding, Def. Br. at 32, in fact all of these requirements work together to

---

[5] AR 4356.

[6] AR 4337.

[7] Assumes the commercial sector lands its entire quota without overage. See AR 4017.

[8] AR 5073.

[9] *Id.*

[10] *Id.*

[11] Assumes the commercial sector lands its entire quota without overage. See AR 4017.

[12] *Recreational Fisheries Statistics Queries*, National Marine Fisheries Service, http://www.st.nmfs.noaa.gov/recreational-fisheries/access-data/run-a-data-query/queries/index (last visited Jan. 9, 2014) (under "Catch Data" select "Time Series;" then query "2013," "Annual," "Gulf of Mexico," "Red Snapper," "All modes by mode," "All areas combined," "Harvest (Type A + B1)," "Weight of fish (pounds)," and "Table"). Does not include Texas and headboats.

protect fish populations and those who rely on them for income or recreation.  By violating what they portray as unnecessary legal requirements, Defendants' actions undermine rebuilding.

### 3. Approving Defendants' Actions Here Would Have National Implications

This case, as Defendants acknowledge, constitutes a challenge to "three recent, discrete NMFS actions" relating to Gulf of Mexico red snapper.[13]  Def. Br. at 2.  But the fundamental MSA requirements at issue here – using the best available science as the basis for management and keeping fishing within quotas – underpin fisheries management across the country.

The 2007 reauthorization to the MSA required ACLs and accountability measures to be developed for most species under federal management.  Def. Br. at 7.  These ACLs are now in place, and Defendants have trumpeted them as putting the Nation's fisheries back on the right track.[14]  Indeed, rebuilding plans for red snapper and other species including Pacific groundfish have produced significant gains.  *See* Paffe Decl. ¶ 7.  But there, as in the Gulf of Mexico, recurrent, sizable overharvest by any one particular sector of that fishery could threaten rebuilding timeframes and would effectively rewrite rebuilding plans without a transparent process while unduly placing the burden for rebuilding on other sectors.  *Id.*  A ruling that allowed Defendants to avoid using available science and violate the MSA's prohibition of "retention of fish caught" after quotas are exceeded, 16 U.S.C. § 1883(d), *see also id.* § 1853(a)(1)(A), would condone illegal behavior and send a dangerous message that could have repercussions in other fisheries.

---

[13] Defendants and Defendant-Intervenor object to examining the red snapper management system in the context of a challenge to the rules governing this fishing season.  *See, e.g.*, Def. Br. at 21-23.  But this challenge is to identified agency actions, and Defendants' long history of management resulting in overages simply underscores the irrationality of their behavior here.

[14] *See Reauthorization of the Magnuson-Stevens Fishery Conservation and Management Act: Oversight Hearing Before the H. Comm. on Natural Res.*, 113th Cong. 77 (2013) (statement of Sam D. Rauch III, Deputy Asst. Administrator for Regulatory Programs, NMFS), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-113hhrg79966/pdf/CHRG-113hhrg79966.pdf.

### B. Defendants' Legal Violations Are Crippling Fishermen Amici's Small Businesses

Fishermen Amici are captains of for-hire recreational fishing vessels that provide access to deep-water recreational fishing for anglers who do not have their own boats. Jarvis Decl. ¶ 2. Typically, they book charters for customers seeking a positive fishing experience on the water and, in many cases, fish to take home and eat. *Id.* ¶ 3. Red snapper is one of the most popular species customers enjoy targeting, *id.*, but Fishermen Amici can only allow their customers to fish for it during the federal fishing season, 50 C.F.R. § 622.20(a)(1).

Under Defendants' preferred – and ineffective – method of shortening the red snapper season to hold the recreational sector to within its quota, Fishermen Amici have seen the number of days during which they can book trips dwindle. As Defendants point out, each year they ratchet down the number of days of fishing, Def. Br. at 28, thereby further constraining Fishermen Amici's business opportunities, Jarvis Decl. ¶ 3.

Fishermen Amici believe alternative methods of recreational fisheries management could provide them with more flexibility to catch the same number of fish spread out over a longer period of time. They have advocated for these proposals at the Council and with the Defendants; they believe that a decision in favor of the plaintiffs here would help ensure solutions are carried out and, hopefully, permit them to remain in the charter fishing business. *Id.* ¶ 5.

### C. Viable Options Exist To Effect Change in the Gulf Red Snapper Fishery

Although the 2013 fishing season is now over, this case presents a classic example of a violation that is capable of repetition yet evading review. *See United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S.*, 721 F.3d 678, 687-89 (D.C. Cir. 2013) (case not moot where challenged action expires within time frame of Supreme Court review and likely subject of future litigation). A decision from this Court

14

holding that Defendants' approval of management measures virtually certain to result in exceeding the recreational quota violated the MSA, along with a remand for further proceedings consistent with the opinion, could open the door to innovative measures that comply with the law, improve the recreational fishing experience, and contribute to the development and conservation of the fishery overall.  Any remand would involve the Council, which has a large role in the rulemaking process, *see* Def. Br. at 44, Def.-Int. Br. at 4-5, and provides a forum for thorough consideration of all stakeholders' views and suggestions.

Indeed, amici and others have proposed solutions over the years that include modified catch share programs for the for-hire sector, harvest tags as used in hunting nationwide, and delegating management authority and responsibility to locally-based institutions.  *See supra* at 5. These measures have received some attention over the years, Paffe Decl. ¶ 6, but a remand would provide the opportunity for a transparent process that can address long-standing concerns. The Court should maintain jurisdiction for a reasonable period of time given that (1) Defendants' legal violations are longstanding; (2) the 2014 regulatory process is already under way, see Def.-Int.' Br. at 11; and (3) periodic status reports impose little burden on Defendants.

## CONCLUSION

Representing both environmental and recreational fishing interests, amici have no desire to see shorter red snapper fishing seasons or other punitive measures directed at the recreational sector.  To the contrary, shorter seasons have failed to prevent overages and caused significant harm to charter businesses, illustrating that Defendants and other stakeholders must seriously review other approaches that offer more hope for conserving the resource and the individuals and businesses that rely on it.  Approving Defendants' actions here will authorize the disregard of the best available science and continued recreational overages, directly threatening ongoing

rebuilding efforts and potentially leading to overfishing.  We urge the Court to grant Plaintiffs'

summary judgment motion.


DATED this 10th day of January, 2014.

Respectfully submitted,


By:_____/s/_____
Monica B. Goldberg, DC Bar No. 459733
Environmental Defense Fund
1875 Connecticut Ave. NW
Suite 600
Washington, DC 20009
Telephone: (202) 572-3266
Facsimile: (202) 234-6049
mgoldberg@edf.org


Adam Babich, D.C. Bar No. 382747
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6321
Phone: (504) 862-8800
Fax : (504) 862-8721
Email: ababich@tulane.edu

Attorney for Billy Archer, Andrew Cantrell,
Scott Hickman, Gary Jarvis, and Theodore
Stephen Tomeny, Jr.