## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH GUINDON, et al.,

                **Plaintiffs,**

    **v.**

PENNY SUE PRITZKER, in her official
capacity as Secretary of the United States
Department of Commerce; NATIONAL
OCEANIC AND ATMOSPHERIC
ADMINISTRATION; and NATIONAL
MARINE FISHERIES SERVICE,

                **Defendants, and**

COASTAL CONSERVATION
ASSOCIATION,

                **Defendant-**
                **Intervenor.**

**Civil Action No. 13-00988 (BJR)**

**MEMORANDUM OPINION
GRANTING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

       This case concerns management of the red snapper fishery in the Gulf of Mexico.

The responsibility of managing the fishery lies with the Secretary of Commerce

("Secretary), through the National Marine Fisheries Service (NMFS), a sub-agency of the

National Oceanic and Atmospheric Administration (NOAA). Plaintiffs are commercial

fishermen challenging three NMFS regulations that set quotas and fishing season lengths

for the recreational sector of the fishery. Plaintiffs bring claims under the Magnuson-

Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884,

the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06, and the National

Environmental Policy Act ("NEPA"), 42. U.S.C. §§ 4321 *et seq.* Plaintiffs, Defendants,

and Defendant-Intervenor have moved for Summary Judgment. Having reviewed the

parties' briefs and the administrative record, and having heard oral argument from all sides, the Court grants Plaintiffs' Motion for Summary Judgment and denies Defendants' and Defendant-Intervenor's cross-motions.

## I.    BACKGROUND

### A.  Statutory and Regulatory Framework

Congress enacted the MSA "to conserve and manage the fishery resources found off the coasts of the United States," "to promote domestic commercial and recreational fishing under sound conservation and management principles," and "to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery."  16 U.S.C. § 1801(b).  As a matter of declared policy, Congress sought "to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available."  *Id.* § 1801(c)(3).

The MSA divides the country into eight regions, and establishes a council in each region to manage the region's marine fisheries.  *See id.* § 1852.  Each regional council must prepare a fishery management plan (hereinafter "FMP") for each fishery that falls under its authority, along with any amendments to the FMP that are necessary from time to time.  *Id.* § 1852(h)(1).  The councils submit FMPs, FMP amendments, and proposed regulations to the Secretary, who reviews the submissions for consistency with the MSA and other applicable laws.  *Id.* § 1854(a).  The Secretary, acting through NMFS, must approve, disapprove, or partially approve the submission within 30 days. *Id.*  Proposals submitted by the Council to the Secretary are also called "framework

actions," in that they provide a framework from which the Secretary may issue one or more implementing regulations.

## 1. National Standards

The legal framework Congress established to direct the management of fish stocks is of necessity multifaceted, specific, and complex. To accomplish the overall goals of the MSA, Congress set forth ten "national standards for fishery conservation and management" at the beginning of the statute. *Id.* § 1851. Three are relevant to this action:

> Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry. *Id.* § 1851(a)(1) ("National Standard 1").

> Conservation and management measures shall be based upon the best scientific information available. *Id.* § 1851(a)(2) ("National Standard 2").

> If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges. *Id.* § 1851(a)(4) ("National Standard 4")

FMPs and FMP amendments must conform to the National Standards. *See id.* § 1851(a). Any proposed regulations must conform to the National Standards and to the FMP. *Id.* §§ 1851(a), 1854(b)(1).

## 2. Other Relevant MSA Provisions

In addition to the National Standards, the MSA contains two other requirements relevant to this action. Section 303(a)(15) of the MSA requires that every FMP "establish a mechanism for specifying annual catch limits in the plan…implementing regulations, or annual specifications, at a level such that overfishing does not occur in the

fishery, including measures to ensure accountability." *Id.* § 1853(a)(15).  Congress added this requirement in 2007.  *See* Pub. L. No. 109-479, § 104(a)(10), 120 Stat 3575, 3584 (2007).

Section 407(d), an MSA provision specific to the Gulf of Mexico red snapper fishery, requires that any FMP, FMP amendment, or implementing regulation must contain conservation and management measures that "establish separate quotas for recreational fishing…and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year." 16 U.S.C. § 1883(d)(1).  Congress added this provision as part of the Sustainable Fisheries Act of 1996.  *See* Pub. L. 104-297, § 207(b), 110 Stat. 3559, 3614 (1996).

It also bears noting that states manage their own waters, and do not always conform to federal rules concerning season length, size limits, or bag limits (the number of fish a fisherman can catch and keep per day).  State regulations thus may affect the federal management scheme.

### 3.  The Secretary's Advisory Guidelines

The Secretary has promulgated various "advisory guidelines" that do not have the force and effect of law but are intended to assist regional councils in developing FMPs. *See id.* §1851(b); 50 C.F.R. §§ 600.305–600.355.  These guidelines flesh out and explicate the National Standards set forth in the MSA.  For purposes of this case, the most relevant guidelines are the ones that explain the statutory objective, expressed in National Standard 1, of "prevent[ing] overfishing while achieving, on a continuing basis, the optimum yield."  16 U.S.C. § 1851(a)(1); 50 C.F.R. § 600.310.

### 4. Catch Limit Terminology

The Secretary balances the twin goals of National Standard 1 – preventing overfishing and achieving optimum yield – through a system of catch limits. The guidelines establish a set of "reference points" for catch limits, starting with the absolute maximum that should be harvested and working down from there. 50 C.F.R. § 600.310(b)(2)(iv). Each reference point uses specific terms and phrases that, for clarity, the Court sets out as follows:

**Maximum Sustainable Yield (MSY)**: MSY is the guiding reference point and the "basis for fishery management." *Id.* § 600.310(b)(2)(i). MSY is the largest catch that can be taken under prevailing environmental conditions, *id.* § 600.310(e)(1)(i)(A), and it relates directly to the concept of "overfishing."

**Overfishing**: "Overfishing" occurs when a stock of fish has a level of fishing mortality or annual total catch that jeopardizes the capacity of the stock to produce the MSY on a continuing basis. *Id.* § 600.310(e)(2)(i)(B).

**Overfishing Limit (OFL)**: The OFL is the catch level above which overfishing occurs. *Id.* § 600.310(e)(2)(i)(D). A regional council's Scientific and Statistical Committee (SSC) sets the OFL each year. The OFL represents the upper boundary in any consideration of catch limits. However, catch limits are not automatically set at the OFL. NMFS also takes into account "scientific uncertainty" and "management uncertainty."

**Scientific Uncertainty**: "Scientific uncertainty" refers to the possibility of error in estimating biomass, mortality rates, and other factors separate from the government's role in fishery management. *See id.* § 600.310(f)(1).

**Management Uncertainty**: "Management uncertainty" refers to uncertainty in the government's management of the fishery, including the accuracy of reported catch data and the ability of the government to constrain the catch. *See id.*

**Acceptable Biological Catch (ABC)**: ABC is an annual catch figure, set at or below the OFL, with the difference between the OFL and the ABC designed to account for scientific uncertainty in the SSC's calculation of the OFL. *Id.* §§ 600.310(b)(2)(v)(D), 600.310(f)(2)(ii). The SSC sets both

the OFL and the ABC. ABC is an expression of the amount of fish that fishermen could harvest during a particular year without overfishing the stock, with accommodation for scientific uncertainty.

**Annual Catch Limit (ACL)**: ACL differs from the ABC in that the ABC estimates the amount of fishing the NMFS *could* permit without overfishing, whereas the ACL represents the amount that the agency actually permits each year. NMFS may set the ACL at or below the ABC.

**Accountability Measures (AMs)**: AMs are "management controls to prevent ACLs, including sector–ACLs, from being exceeded, and to correct or mitigate overages of the ACL if they occur." *Id.* § 600.310(g)(1). "AMs should address and minimize both the frequency and magnitude of overages and correct the problems that caused the overage in as short a time as possible." *Id.* The guidelines describe two kinds of AMs: "inseason" AMs, and "AMs for when the ACL is exceeded," referred to by the parties as "postseason AMs." *Id.*

**Inseason AMs**: Inseason AMs are AMs that the agency implements during the fishing season to constrain catch. One inseason AM, often referred to as a "buffer," involves setting the amount of permitted catch below the ACL to guard against management uncertainty. *Id.* § 600.310(g)(2). Other inseason AMs include closing the fishery when the ACL has been exceeded or is projected to be reached, and lowering the bag limit. *Id.*

**Postseason AMs**: The guidelines instruct regional councils to determine as soon as possible after the end of the season whether the ACL has been exceeded. *Id.* 600.310(g)(3). If so, one postseason AM would be to revise the inseason AMs applicable to the next season, in order to prevent another overage. *Id.* Another postseason AM is an "overage adjustment," also known as a "payback" provision, where the NMFS reduces the next season's ACL to account for the overage. *See id.* If catch exceeds the ACL more than once in four years, the regulations provide that "the system of ACLs and AMs should be re-evaluated, and modified if necessary, to improve its performance and effectiveness." *Id.*

**Rebuilding Plan**: A rebuilding plan is a multiyear management plan that aims to return a fishing stock to productive capacity in a certain timeframe. If a stock is subject to a rebuilding plan, postseason AMs "should include overage adjustments that reduce the ACLs in the next fishing year by the full amount of the overages, unless the best scientific information available shows that a reduced overage adjustment, or no adjustment, is needed to mitigate the effects of the overages." *Id.*

**Sector-ACLs and Sector AMs**:  ACL may be divided into sectors (*e.g.* recreational or commercial).  *Id.* § 600.310(f)(2)(iv).  The guidelines specify that "if the management measures for different sectors differ in the degree of management uncertainty, then sector ACLs may be necessary so that appropriate AMs can be developed for each sector."  *Id.* § 600.310(f)(5)(ii).

### B.  Management of the Gulf of Mexico Red Snapper Fishery

#### 1.  How NMFS Establishes Quotas and Sets Season Length

The Gulf of Mexico Fishery Management Council ("Council") is the regional council charged with managing red snapper and other reef fish species in the Gulf of Mexico.  *See* 16 U.S.C. § 1852(E).  The Council's area includes Texas, Louisiana, Mississippi, Alabama, and Florida.  *Id.*

In managing the fishery, the Council and NMFS rely on the Southeast Data, Assessment, and Review (or "SEDAR") stock assessment, which is a periodic evaluation of the red snapper stock that encompasses the amount and weight of fish, spawning data, mortality rates, and other indicators related to the size and health of the fishery.  *See* AR 1097.  As SEDAR stock assessments become available, the Council uses them to set future management plans or adjust existing plans.

Each year, before the red snapper season begins, the Council receives a recommendation as to that year's Acceptable Biological Catch (ABC) from the Council's Scientific and Statistical Committee (SSC).  The Council then proposes to NMFS a red snapper "quota" for the year.  The recommended quota is intended to serve as the total ACL for red snapper in the Gulf of Mexico fishery.[1]  Because the quotas include fish harvested in adjoining state waters, NMFS must take those state harvests into account in

---

[1] "Quota" is used to refer to red snapper catch limits because the 2007 MSA amendment referred not to "annual catch limits" but to "quotas for recreational fishing…and commercial fishing."  *See* 16 U.S.C. § 1883(d)(1).  NMFS has determined that quotas and ACLs are functionally equivalent, and that the sum of the recreational and commercial quotas is equivalent to a stock ACL.  AR 4784.

managing the Gulf of Mexico red snapper fishery.  *See* 50 C.F.R. § 622.8(a).  Pursuant to

Section 407(d) of the MSA, the fishery is subdivided into recreational and commercial

sectors, with separate quotas for each.  Thus, the Council will also specify the allocation

of the total quota between the commercial and recreational sectors.  Currently, the FMP

specifies that the commercial sector receives 51 percent of the quota and the recreational

sector receives 49 percent.  AR 5074.

NMFS manages the commercial and recreational sectors differently.  In the

commercial sector, each participant receives an Individual Fishing Quota ("IFQ"), which

entitles that participant to a fixed, specific portion of the annual commercial catch.  *See*

50 C.F.R. § 622.21.  Commercial vessels must install geographical monitoring systems

and may only sell their catch to authorized dealers.  *See id.* §§ 622.28 ("Vessel

Monitoring Systems"), 622.40 ("Restrictions on Sale/Purchase").  Since 2007, these

management measures have assured that the commercial sector does not exceed its quota.

AR 4782.  In fact, as the 2010 Amendment to the Reef Fish FMP observed, "there is no

possibility of a quota overrun for the commercial sector."  AR 369.

By contrast, NMFS manages the recreational sector using only size limits, bag

limits, and length of season.  The only AM currently in place for the recreational sector is

in-season closure of the fishery.  *See* 78 FR 17882, 17883 (Mar. 25, 2013) ("The in-

season closures are the accountability measures for the recreational red snapper sector.").

NMFS estimates in advance how long it will take for the recreational sector to harvest its

quota, based on historical data, then sets the season length according to that projection.

AR 4262.

The primary data source for estimating recreational "landings" (total weight of red snapper caught) is the Marine Recreational Information Program (MRIP).[2] NMFS implemented MRIP several years ago in an effort to improve the quality of the agency's landings estimates. AR 4665. MRIP data are collected in two-month "waves," with data available 45 days after the wave ends. AR 761. MRIP produces an estimate of red snapper landings through a combination of "dockside intercepts" (referred to as "landings data") and phone surveys (referred to as "effort data"). AR 4714.

The dockside intercept program, known as the Access Point Angler Intercept Survey (APAIS), involves communicating with recreational fishermen when they return from fishing trips. AR 5073. Of particular relevance to this case is an alteration to the APAIS sampling design that NMFS made in March 2013. *See* AR 4999. The change allowed NMFS to capture data from fishing trips at time intervals during the day that the agency had not previously sampled. AR 5000.

## 2. Recent History of Recreational Sector Management

Red snapper stock is managed under the Reef Fish Fishery Management Plan ("Reef Fish FMP"), first implemented by the Secretary in 1984. AR 6. At that time the agency had already observed declines in the adult population of red snapper. *Id.* The Council first amended the Reef Fish FMP in 1990 ("Amendment 1"), with the goal of stabilizing long-term population levels by 2000. AR 371. Red snapper is currently designated as "overfished," and is subject to a rebuilding plan.[3] Over time NMFS has

---

[2] NMFS also uses a "headboat" survey performed by the Southeast Fisheries Science Center, and a Texas Parks and Wildlife Department survey of charter and private fishers. AR 4714. Those surveys are not at issue in this case.

[3] A stock is considered "overfished" when its biomass has declined below a level that jeopardizes the capacity of the stock to produce MSY on a continuing basis. 50 C.F.R. § 600.310(e)(2)(i)(E). Because it takes time for biomass levels to recover, a stock may be designated as "overfished" even when "overfishing" is not currently taking place. The Gulf of Mexico red snapper stock fits that description.

extended the target date to complete rebuilding of the stock. AR 368. Currently the target is 2032. *Id.*

Amendment 1 to the Reef Fish FMP required that the annual catch be allocated between recreational and commercial sectors based on historical percentages. AR 12. The regulations implementing Amendment 1 set the allocation at 51 percent commercial and 49 recreational, an allocation that survives to the present. *See* AR 5074.

Prior to 1997, the Secretary permitted recreational red snapper fishing year-round, with catch levels constrained only by bag and size limits. AR 4346. From 1997 to 1999, NMFS used in-season monitoring, along with data from prior seasons, to project when the quota would be reached and when to close the season. AR 4346. "In-season monitoring" meant that, during the fishing season, an NMFS "quota monitoring team" tracked available landings data and combined that data with past patterns to project when recreational sector would reach its quota. *Id.* The agency would announce the closure date several weeks in advance. *Id.*

For the 2000 season NMFS abandoned its in-season quota monitoring operation and began setting fixed season lengths in advance, based only on projections of when the quota would be reached. *Id.*[4] In 2000, NMFS set the recreational quota at 4.47 million pounds, with a 2-fish bag limit and a season lasting from April 21 to October 31. AR 4347. The quota, bag limit, and season length established in 2000 remained in effect through 2007. *Id.* During that period, recreational landings exceeded the quota in some years and fell below in others. AR 3524.

---

[4] This did not mean that NMFS stopped gathering landings data. It only meant that, during the season, NMFS no longer monitored the sector's progress in harvesting toward the quota.

In 2008, the Council amended the Reef Fish FMP with the goals of ending red snapper overfishing by 2009 or 2010 and rebuilding the stock by 2032. AR 368. To that end, the Council prohibited fishing from January 1 to May 31 and from October 1 to December 31. AR 4347. This meant that NMFS could not open the season until June 1, and could not keep it open past September 30.

The recreational quota for the 2008 season was reduced to 2.45 million pounds. AR 3524. NMFS set a 66-day season for 2008, closing August 5 rather than September 30, in light of decisions by Florida and Texas not to conform to federal rules. AR 4347. Even so, recreational landings exceeded the 2008 quota by 1.26 million pounds, or about 51 percent. AR 3524.

For 2009, with the same recreational quota of 2.45 million pounds, NMFS set the season at 75 days. AR 4347. The recreational landings exceeded the quota by 2.175 million pounds, or about 88 percent. AR 3524.

For 2010 NMFS raised the recreational quota to 3.403 million pounds, and set the season at 53 days. AR 4347. The Deep Water Horizon spill cut the season short. AR 4347.

NMFS set the 2011 recreational quota at 3.521 million pounds, and projected a 48-day season on the basis of that quota. AR 4348. After the season ended, but before NMFS had received preliminary landings estimates, the Council authorized raising the recreational quota by 0.345 million pounds and suggested reopening the season in the fall. *Id.* NMFS adopted the Council's recommended quota increase. *Id.* However, preliminary June and July landings estimates indicated that recreational landings had exceeded not only the original quota but also the newly increased quota. *Id.* For that

reason, NMFS did not reopen the 2011 season. *Id.* The final estimates revealed that recreational landings exceeded the 2011 quota by 734,000 pounds. AR 3524.

In 2012, NMFS removed the restriction on fall fishing, such that the recreational season would not automatically close on October 1. This change allowed NMFS more flexibility to reopen the season in the fall, if it determined that additional quota was available. *See* 77 FR 31734, 31737 (May 30, 2012).

The 2012 recreational quota was set at 3.959 million pounds. AR 3524. The agency initially set a 40-day season, but extended six more days in light of extreme weather conditions. AR 4347. The 2012 recreational landings exceeded the quota by 1.187 million pounds, or about 30 percent. AR 3524.

### C. The Challenged Agency Actions

#### 1. The May Final Rule and June Temporary Rule

A 2012 regulatory amendment to the Reef Fish FMP set total quotas for both 2012 and 2013. AR 1086. The total quota for 2013, including commercial and recreational, was set at 8.69 million pounds, an increase over 2012. AR 1086. The 2012 FMP amendment specifically stated that the 2013 quota increase was contingent on the acceptable biological catch not being exceeded in 2012, and provided that "[i]f NMFS determines the 2012 ABC is exceeded, NMFS will maintain the 2012 commercial and recreational quotas in the 2013 fishing year." *Id.*

As discussed above, the recreational sector did exceed its quota in 2012, by 1.187 million pounds. AR 3524. The Council's SSC nevertheless set the 2013 ABC at 8.46 million pounds, rather than at the 2012 quota level (8.08 million). AR 2294. The SSC

declined to offer any guidance beyond 2013, because it expected a new stock assessment in 2013. *Id.*

The Council met in February 2013 to consider the SSC's recommendations. AR 2926; AR 4335. It published its recommendation in the form of a Framework Action, issued on March 26, 2013 ("March Framework Action").[5] The Council cited preliminary data indicating that the recreational sector had exceeded the 2012 quota of 3.959 million pounds by over a million. AR 4344. Three quota alternatives for 2013 were considered: (1) no action (*i.e.*, leaving the 2013 quota at 2012 levels), (2) setting the quota at the level of the 2013 ABC (8.46 million pounds), and (3) implementing a 20 percent buffer for the recreational sector. AR 4349. The Council chose the second alternative, recommending a quota of 8.46 million pounds, equal to the ABC, with no buffer. *Id.* Though, as the Council recognized, this was "not as biologically conservative" as the buffer alternative, the Council observed that it "ha[d] managed the recreational red snapper sector based on the ABC for several years." *Id.*

In light of plans by the Gulf states to implement season lengths and bag limits inconsistent with the proposed federal regulations, NMFS published an emergency rule on March 25, 2013, authorizing state-specific closure dates for the recreational sector. 78 FR 17883. A final rule published on May 29, 2013 (the "May Final Rule") approved the Council's recommended quota of 8.46 million pounds. AR 4680. This created a commercial quota of 4.315 million pounds and a recreational quota of 4.145 million pounds. *Id.* The May Final Rule also established individual closure dates for each Gulf state. *Id.*

---

[5] Plaintiffs refer to this document as the "February Framework Action," due to the meeting date, but in the interests of clarity the Court will refer to it by its publication date.

However, the District Court for the Southern District of Texas vacated the emergency rule on May 31, 2013, finding that the rule "was not enacted in compliance with the required criteria for emergency measures," and also that the state-specific closure dates "impermissibly discriminate[d] against citizens of different states in violation of 16 U.S.C. § 1851(a)(4)." *Texas v. Crabtree*, 948 F. Supp. 2d 676, 690 (S.D. Tex. 2013).

NMFS responded to the court's decision by publishing a temporary rule (the "June Temporary Rule"), which eliminated the state-specific closure dates and set a Gulf-wide recreational sector closure date of June 29, 2013. 78 FR 34586, 34587. The 8.46 million pound quota remained in effect. NMFS set the season length at 28 days to reflect the agency's projections as to when the recreational quota would be reached. *Id.* at 34586.

### 2. The September Final Rule

A new stock assessment arrived in May of 2013, as anticipated. AR 4778. The SSC reviewed the stock assessment and determined that the ABC for 2013 could be increased to 13.5 million pounds total, as long as it fell to 11.9 and 10.6 million pounds in 2014 and 2015, respectively. *Id.* Because the ABC was set very close to the overfishing limit (OFL), with only a small affordance for scientific uncertainty, the SSC also recommended a 20 percent buffer to account for management uncertainty. *Id.*

The full Council did not meet until July 2013, after the 28-day June fishing season had closed. The Council published another framework action (the "July Framework Action") recommending that NMFS set the 2013 quota below the ABC, at 11 million pounds rather than 13.5 million pounds, in order to achieve a "constant catch" in 2014

and 2015. *Id.* The Council determined that setting the 2013 quota at 11 million pounds would reduce the likelihood that NMFS would have to decrease quotas in 2014 and 2015. *Id.*

The Council also suggested reopening the season in the fall to allow for harvesting of the additional quota amount, but only "contingent upon there being unused quota available." AR 4786. Every alternative considered by the Council specified that there must be unused quota available for NMFS to reopen the season. *Id.* The Council noted that "[b]ecause of the potential for a quota overage during the June season, the full amount of a quota increase may not be available." *Id.* Thus, the length of the reopened season "would be based on the landings from the June season subtracted from the total recreational quota (original quota plus increase)." *Id.* The Council also opined that a split season "would allow NMFS to better determine how much quota is available before setting the closing date for the supplemental season, which should result in more accurate projections for 2013." AR 4785.

Though the Council considered the SSC's suggestion of a 20 percent buffer, it did not adopt the proposed buffer. The Council explained that the distance between the ABC (13.5 million) and the 2013 quota (11 million), which the Council recommended in order to achieve a constant catch through 2013, 2014, and 2015, would also function as a "de facto buffer" against overages in the recreational sector. AR 4785. According to the Council, "an additional buffer [was] not necessary to prevent risking the rebuilding plan or overfishing." *Id.* The Council acknowledged that "management uncertainty was high for the recreational sector," based on "quota overages in recent years," but maintained that "reductions in overages are likely for upcoming years because the recent benchmark

stock assessment provides data that is more updated than what has recently been used for projections and is based on better models, and because the system for collecting recreational data has improved." *Id.*

Also in July 2013, before NMFS knew how much red snapper had been caught during the June 2013 season, the agency evaluated how long a fall season might last. AR 5006. Based on historical landings data, NMFS estimated that the fall catch rate would be roughly 50 percent of the summer catch rate. *Id.* At that rate, the proposed quota increase would allow NMFS to reopen the fishing season for 21 days in the fall. *Id.* This 21-day estimate assumed that recreational landings in the June 2013 season had met, without exceeding, the quota then in effect (4.145 million pounds). AR 5011.

On August 14, 2013, NMFS published a Notice of Proposed Rulemaking, describing the proposal to increase the 2013 quota to 11 million pounds total. 78 FR 49440, 49441. An 11 million pound total quota would allow 5.61 million pounds for the commercial sector and 5.39 million for the recreational sector. NMFS explained in the notice that "[i]f this rule is implemented and the recreational quota for red snapper were to increase, NMFS may be able to reopen the recreational season for red snapper during 2013, if additional quota is available after the June landings are known." *Id.*

In late August, NMFS received the June 2013 landings estimates. As it turned out, MRIP landings estimates indicated that recreational fishermen actually caught 6.13 million pounds of red snapper during the June 2013 season. AR 5073. This exceeded NMFS's estimate of what would be caught during the 28-day June season by 1.985 million pounds. It also exceeded the proposed new quota by 740,000 pounds.

A question emerged as to the cause of the large overage. Ned Cyr, the Director of the NMFS Office of Science and Technology (OST), analyzed the MRIP landings estimates to determine why they were "higher than anticipated." AR 4999. Cyr noted as a possible cause that NMFS had recently implemented several improvements to the MRIP sampling methodology, specifically the change to APAIS sampling design. *Id.*; *see* Part I(B)(1), *supra*.

OST analyzed whether any of the 2 million pound overage "could be attributable to any changes in the sampling design." AR 4999. The analysis indicated that "sampling under the new design was capturing charter and private boat angler fishing trips in time intervals that had no sampled trips in the previous years." *Id.* In other words, the staff conducting dockside interviews had reached fishermen at new times of day. This "raised concern that the improved temporal coverage may have been partly responsible for the big increase in red snapper catch, especially if trips returning in these previously uncovered time intervals tended to be more directed to offshore fishing and red snapper." AR 5000.

To assess how much of the overage was due to improved sampling, OST attempted to simulate what the 2013 recreational landings would have been under the old APAIS sampling design. AR 5000-5001. By removing the variable of sampling design from the equation, OST hoped to determine how much, if any, of the 2 million pound overage could be attributed to the design change. The simulations "did not provide strong evidence that effects related to the change to the new, improved…sampling design could easily explain much of the increase in the red snapper catch estimates from 2012 to 2013." AR 5001. Cyr characterized the analyses performed by OST as "inconclusive."

*Id.* He admitted that OST "[had] not been able to demonstrate that the change to the new APA1S sampling design had a significant effect," though he also cautioned that OST could not "safely conclude at this time that the change in design had no effect." *Id.*

On September 9, 2013, Bonnie Ponwith, Director of the Southeast Fisheries Science Center, recommended that instead of using the MRIP landings estimate, which was 6.13 million pounds, NMFS should assume that the recreational sector caught exactly as much as the agency projected would be caught during the June 2013 season – *i.e.*, 4.145 million pounds. AR 5003. Ponwith acknowledged that reopening the fishing season in October 2013 was "premised on landings from the June season falling at or below the recreational quota currently in place." *Id.* Assuming a catch of 4.145 million pounds would allow NMFS to reopen the season. *Id.*

According to Ponwith, the "new dockside intercept protocols" made using the actual 2013 MRIP estimates "complicated." *Id.* The 2013 quota was set based on landings estimates that used old sampling protocols, whereas the 2013 MRIP estimates used newer protocols, so Ponwith deemed the figures "non-comparable." *Id.* She noted that OST's evaluation was inconclusive, and further analysis would not be complete before NMFS decided whether to reopen the fishing season in October. *Id.* For that reason, she concluded that "currently the best scientific information available for determining the landings during the June season is the projection that was used to set the season length." *Id.* Ponwith acknowledged that "[t]here is uncertainty in the projection, because it is based on assumptions about effort levels, catch-per-unit effort and average weights for landed fish." *Id.* Accordingly, she recommended that "this uncertainty should be factored into decisions about season length for the fall season." *Id.*

In preparation for issuing a final rule, NMFS drafted an addendum to its previous assessment of possible fall season length, which had projected a 21-day fall season. *See* AR 5011. The agency recognized that its prior estimate was "contingent on the previous quota of 4.145 [million pounds] being met, but not exceeded during the June 2013 [season]." AR 5011. NMFS noted that the MRIP estimates indicated a 1.98 million pound overage. *Id.* NMFS also explained that MRIP catch estimates for June 2013 were "more accurate and less biased than those produced in past years because MRIP redesigned the Access Point Angler Intercept Survey in March 2013 to provide much better coverage of the variety of fishing trips ending at different times of day." *Id.* The addendum echoed Ponwith's conclusion that the 2013 quota and the 2013 MRIP landings estimates were "not directly comparable." *Id.* Because NMFS could not form "a sufficient understanding of how to use the new MRIP landing estimates without better understanding how they fit into the broader scientific basis for red snapper management," the agency "determined the best course of action is to base a decision on whether to proceed with a fall season using previous projections developed for estimating the supplemental season length." *Id.*

As discussed above, NMFS had previously projected that catch rates in the fall would be 50 percent of summer catch rates. However, public testimony indicated that fall fishing effort might prove higher than NMFS had expected. *Id.* NMFS deemed it unrealistic to assume that fall catch rates would exactly equal summer catch rates, due to "children being in school, inclement weather, and other activities, such as hunting and football." AR 5013. To account for possible increased effort in the fall, as well as "questions about the new data," NMFS chose to split the difference and assume fall catch rates would be 75 percent of summer catch rates. AR 5012. This meant a 14-day season rather than a 21-day season. *Id.*

On September 18, 2013, NMFS published a final rule (the "September Final Rule") increasing the 2013 quota to 11 million pounds and setting a 14-day fall fishing season. 78 FR 57313, 57315. The final rule describes the June 2013 landings estimates as "unexpectedly high relative to previous years." *Id.* at 57314. NMFS stated that "[i]t is misleading to make a direct comparison between these numbers, however, because if the new MRIP methodology had been available to use in the 2013 stock assessment on which the current ABCs and quotas are based, then the original quotas may have been set much higher." *Id.* The September Final Rule includes NMFS's conclusion that "the best scientific information available to determine landings during the June season is the projection used to set the season length." *Id.*

### D. Procedural History

Plaintiffs filed suit challenging the May Final Rule and the June Temporary Rule on June 28, 2013. *See* Dkt. #1. The parties then moved to stay the case, anticipating NMFS would publish another final rule for the fall 2013 season and that Plaintiffs would seek to amend their complaint to include a challenge to that rule. The Court granted the stay, and also granted the Coastal Conservation Association's motion to intervene on behalf of Defendants. *See* Dkt. #33. After NMFS published the September Final Rule, Plaintiffs amended their Complaint to include a challenge to that rule as well. *See* Dkt. #31.

Plaintiffs claim that NMFS violated the following MSA provisions: Section 407(d) (16 U.S.C. § 1883(d)(1)), National Standard 2 (16 U.S.C. § 1851(a)(2)), Section 303(a)(15) (16 U.S.C. § 1853(a)(15)), Section 304(b) (16 U.S.C. § 1854(b)(1)), National Standard 4 (16 U.S.C. § 1851(a)(4)), National Standard 1 (16 U.S.C. § 1851(a)(1)), and Section 303(a)(1)(A) (16 U.S.C. § 1853(a)(1)(A)). *See* Pls' First Amended Complaint

("Compl."), Dkt. #31, ¶¶ 86-119.[6]  Plaintiffs also bring claims under the APA and NEPA. *See id.* ¶¶ 121-31.

The Court granted the parties' request for expedited proceedings.  Plaintiffs, NMFS, and CCA have all filed motions for summary judgment.  The Court heard oral argument on February 11, 2014.

## II.  LEGAL STANDARD

Under the MSA, the Court reviews the regulatory actions at issue in this case under the standard set forth in the APA, except that a court "shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of [the APA]."  16 U.S.C. § 1855(f)(1).  Under Section 706 of the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[7]

Under the APA's "narrow" standard of review, "a court is not to substitute its judgment for that of the agency," *Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983), and "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record.'" *Oceana, Inc. v. Locke,* 670 F.3d 1238, 1240 (D.C. Cir. July 19, 2011) (quoting *C & W Fish Co. v. Fox,* 931 F.2d 1556, 1562 (D.C. Cir. 1991)).

Nevertheless, to meet the APA standard an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection

---

[6] Plaintiffs' Amended Complaint also includes an alleged violation of National Standard 5, 16 U.S.C. § 1851(a)(5).  However, Plaintiffs have relinquished that claim.  *See* Pls' Reply in Support of Plaintiffs' Motion for Summary Judgment, Dkt. #49, at 13 n.22.
[7] Review of agency actions under NEPA is also performed according to the APA standard.  *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97–98 (1983).

between the facts found and the choice made." *Id.* (internal quotation omitted). An agency acts arbitrarily and capriciously "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of agency expertise." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 48). "This deferential standard cannot permit courts to 'merely to rubber stamp agency actions,' nor be used to shield the agency's decision from undergoing a 'thorough, probing, in-depth review.'" *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 47 (D.D.C. 2012) (internal citations omitted). The court should evaluate "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

## III.    DISCUSSION

### A.  CCA's Procedural Challenges

Defendant-Intervenor Coastal Conservation Association (CCA) raises a host of procedural challenges. CCA contends that Plaintiffs lack Article III standing on all claims, and that all claims are moot in light of the 2013 season closure. Defendant-Intervenor's Cross-Motion for Summary Judgment ("Defendant-Intervenors Mot."), Dkt. #43, at 20, 36. CCA also argues that Plaintiffs abandoned certain claims, and waived others by not raising them before the agency. *Id.* at 12, 14. Finally, CCA insists that some of Plaintiffs' claims are challenges to agency inaction, and thus fall outside the scope of judicial review authorized by the MSA. *Id.* at 21; Defendant-Intervenor's Reply

in Support of Cross-Motion for Summary Judgment ("Defendant-Intervenor's Reply"),
Dkt. #50, at 8.

For the reasons given below, the Court concludes that: (1) Plaintiffs have standing to
sue; (2) the case is not moot; (3) Plaintiffs preserved all but one claim, which they
acknowledge abandoning; (4) Plaintiffs properly raised their objections before the agency
in administrative proceedings; and (5) the challenged actions fall within the judicial
review provisions of the MSA.

### 1. Plaintiffs Have Article III Standing

"To satisfy Article III's standing requirements, a plaintiff must show that (1) he or
she has suffered an injury in fact that is (a) concrete and particularized and (b) actual or
imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the
challenged action of the defendant; and (3) it is likely, as opposed to merely speculative,
that the injury will be redressed by a favorable decision." *Gilardi v. U.S. Dept. of Health and
Human Serv.*, 733 F.3d 1208, 1228 (D.C. Cir. 2013). "[I]n reviewing the standing
question, the court must be careful not to decide the questions on the merits for or against
the plaintiff, and must therefore assume that on the merits the plaintiffs would be
successful in their claims." *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir.
2003).

CCA claims that Plaintiffs have no "injury in fact" because jeopardy to long-term
stock conservation is neither actual nor imminent. Defendant-Intervenor's Mot. at 27.
CCA also contends that the challenged actions have not reduced or affected the
commercial fishing quota. *Id.* at 29. Even if Plaintiffs could prove an injury, CCA
argues, the alleged injury is not fairly traceable, or likely to be redressed, because

Plaintiffs have not shown a connection between management of the recreational sector and injuries to the commercial sector. *Id.* at 30-31.[8]

The Court need not address this matter in great depth, as the Plaintiffs' standing to bring this suit is self-evident. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) ("In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it."). Plaintiffs are commercial red snapper fishermen. Compl. ¶ 2. They allege that the challenged agency actions led to an overharvesting of red snapper that threatens their livelihood. *Id.* It is self-evident that overharvesting of red snapper in either sector could negatively impact both sectors' interests in the fishery's health. Plaintiffs have also explained how overages in the recreational sector could affect the plan for a "constant catch" in 2014 and 2015. *See* Pls' Motion for Summary Judgment ("Pls' Mot."), Dkt. #42, at 34; Pls' Reply at 4; *see also* AR 4860, 5074 (explaining that a higher 2013 catch would require lower quotas in 2014 and 2015, for both recreational and commercial sectors).

CCA cites no case in which a group of fishermen were denied standing to challenge a rule that regulated the amount of catch in their fishery. Courts in this Circuit have granted standing to similar plaintiffs in the same (or even more attenuated) circumstances. *See*, *e.g.*, *Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 136-38 (D.D.C. 2013) (granting environmental group standing to challenge bluefin tuna management measures, even where quota was not reduced); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 48 (D.D.C. 2012) (granting standing where the plaintiffs claimed that their

---

[8] The Court notes that the federal defendants do not challenge Plaintiffs' standing on the MSA and APA claims.

ability to harvest striped bass was harmed by NMFS's failure to adopt adequate conservation measure to protect the Atlantic herring upon which striped bass feed); *Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 10 (D.D.C. 2000) (granting standing to recreational fishermen who alleged that NMFS management measures failed to prevent commercial fishers from damaging fish habitats); *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 81-83 (D.D.C. 2007) (granting standing to commercial fishermen who challenged management restrictions on commercial snapper-grouper fishery).

The Court sees no reason to deny standing to Plaintiffs simply because Plaintiffs are commercial fishermen challenging management of the recreational sector. Red snapper fishermen, commercial or recreational, harvest the same stock from the same waters. Overharvesting of red snapper is as likely to injure commercial as recreational fishing interests, and overharvesting is directly traceable, indeed dependent upon, NMFS's management actions or lack thereof. Furthermore, the Court's decision in this case is likely to redress Plaintiffs' injury. Accordingly, Plaintiffs have Article III standing.

## 2. Plaintiffs' Claims are Not Moot

"A case becomes moot…when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (internal quotation omitted). Unless and until "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party," the case is not moot. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009).

The mootness doctrine does not apply where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, AFL-CIO* ("*Carpenters*"), 721 F.3d 678, 687 (D.C. Cir. 2013) (internal quotation omitted).  This is known as the "capable of repetition yet evading review" exception.  *Id.*

An action is "capable of repetition" if there is "a reasonable degree of likelihood that the issue will be the basis of a continuing controversy between the two parties." *Id.* at 688 (quotation omitted).  Courts focus not on "whether the precise historical facts that spawned the plaintiff's claims are likely to recur," but rather on "whether the legal wrong complained of by the plaintiffs is reasonably likely to recur." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).  "In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *Carpenters*, 721 F.3d at 688 (quoting *Clarke v. United States,* 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc)).  An action "evades review" where "the challenged activity is by its very nature short in duration, so that it could not, or probably would not, be able to be adjudicated while fully live." *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985) (internal quotations and emphasis omitted).

The NMFS actions Plaintiffs challenge are precisely the sort of agency actions for which the "capable of repetition yet evading review" exception exists.  The "legal wrongs" at issue are alleged failures by NMFS to comply with MSA requirements, leading to overages in the recreational sector.  In future agency decisions, the

administrative records will by necessity differ at least somewhat from the record before the Court, but the same "legal wrongs" may well recur. Overages in the recreational sector have occurred in six of the last seven years. This frequency suggests that future overages are at a minimum "capable of repetition." *See Carpenters*, 721 F.3d at 688.

NMFS may publish quotas and season lengths right up to the moment the fishing seasons begins, and even after it has begun. The season may last less than a month. In this case, NMFS published the May Final Rule on May 29, 2013, two days before the beginning of the 2013 fishing season. AR 4680. The June Temporary Rule, which set a Gulf-wide closing date, was published ten days into the season. *See* 78 FR 34586, 34587. NMFS published the September Final Rule less than two weeks before reopening the fishing season on October 1, 2013. *See* 78 FR 57313, 57315. Such actions "could not, or probably would not, be able to be adjudicated while fully live." *Conyers*, 765 F.2d at 1128. For these reasons, Plaintiffs' case satisfies the "capable of repetition yet evading review" exception to the mootness doctrine.[9]

### 3. Plaintiffs Preserved All But One Claim

Claims not briefed may be deemed abandoned. *See Terry v. Reno*, 101 F.3d 1412, 1415 (D.C. Cir. 1996). CCA argues that Plaintiffs have abandoned their claims under National Standard 5 (16 U.S.C. § 1851(a)(5)), National Standard 1 (16 U.S.C. § 1851(a)(1)), 16 U.S.C. § 1853(a)(1)(A), and a portion of their APA claim concerning NMFS's determination of the projected catch rate in the fall 2013 fishing season. *See* Defendant-Intervenor's Mot. at 12. CCA also contends that Plaintiffs have abandoned all

---

[9] As with standing, the federal defendants do not join CCA in arguing mootness. It is instructive that the agency apparently accepts that Plaintiffs have standing, and that this Court can grant relief.

claims related to the June Temporary Rule. *Id.* Plaintiffs concede that they have abandoned their claim under National Standard 5. *See* Pls' Reply at 13, n. 22.

Plaintiffs' briefs demonstrate that they preserved all other claims. National Standard 1, 16 U.S.C. § 1853(a)(1)(A), is mentioned explicitly, and by implication, throughout Plaintiffs' briefs. *See* Pls' Mot. at 29-30, n. 24. Plaintiffs also explain in their opening and reply briefs why NMFS erred in adjusting the catch rate for the fall 2013 season, which preserves that portion of their APA claim. *See id.* at 19; Pls' Reply at 18. Finally, in challenging the 28-day June 2013 season, Plaintiffs thereby directly challenged the portion of the June Temporary Rule that set the Gulf-wide fishing season length. *See id.* at 14 (noting that "NMFS set the recreational fishing season for June 2013 in the May Final Rule and June Temporary Rule," and arguing that "NMFS violated Section 407(d) by authorizing a 28-day recreational fishing in June that resulted in a 48% overage"). This preserved Plaintiffs' challenge to the June Temporary Rule.

### 4. Plaintiffs Properly Raised Their Concerns with NMFS

"[A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration." *Flaherty*, 850 F. Supp. 2d at 57 (quoting *Advocates for Highway & Auto Safety*, 429 F.3d at 1150). Plaintiffs must "alert the agency to their position and contentions, in order to allow the agency to give the issue meaningful consideration." *Id.* However, courts have found this requirement satisfied where a third party raised the issue during administrative proceedings, or where an agency's decision "indicates that the agency had the opportunity to consider the very argument pressed by the petitioner on judicial review."

*Natural Res. Def. Council, Inc. v. E.P.A.*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (internal quotations omitted).

CCA contends that Plaintiffs failed to raise their issues before the agency in advance of the May and September Final Rules.[10] CCA also emphasizes that three of the plaintiffs submitted a comment supporting the proposal that became the September Final Rule, and that Plaintiffs never "proposed a specific accountability measure that NMFS should adopt." Defendant-Intervenor's Mot. at 15, 19.

Upon review of the comments submitted on the May and September Final Rules, it is evident that NMFS was presented with the objections underlying this action and had a fair opportunity to consider them.

### a. Comments on the May Final Rule

Plaintiff Wayne Werner's comments on the May Final Rule complained that "[t]he existing plan contains no accountability measures as required by the law." AR 4620. Specifically, Werner noted that "[t]he overage from the previous year is not deducted from the following year's quota; the enforcement and monitoring does not increase; the number of anglers is not capped." *Id.* Werner cited MSA Section 407(d)'s requirement that NMFS prohibit the retention of fish above the quota, explaining that "the agency has established a pattern of failing to prohibit the retention of fish far after the recreational quota has been reached," a "violation of the provision." *Id.* Werner asserted that the recreational overages actually operate to "reallocate quota from the commercial to the recreational sectors." *Id.* Citing National Standard 4, Werner wrote

---

[10] CCA also argues that all claims against the May Final Rule were "merged" into claims against the September Final Rule. *See* Defendant-Intervenor's Mot. at 18. CCA does not explain why such a merger should make irrelevant any comments Plaintiffs submitted to NMFS in connection with the May Final Rule. Accordingly, the Court considers separately the Plaintiffs participation in each rulemaking.

that "continued effective reallocation by allowing the recreational sector to exceed its catch is unfair and does not promote conservation." AR 4621.

Plaintiff Fish for America's comments on the May Final Rule echoed all of Werner's objections. Fish for America suggested that NMFS sets the recreational fishing season length "with full knowledge that the lack of monitoring and other factors will result in continued overages the following year with no payback provisions in place." AR 4623. Fish for America also elaborated on the reallocation complaint: "Although the recreational quota is technically limited to 49 percent of the total, the understanding that it will be exceeded in practice makes that technicality meaningless and results in an effective violation of 407(d)." AR 4624.

A third party, the Environmental Defense Fund (EDF), raised similar concerns in its comments. EDF referenced "the history of consistent overages in the recreational red snapper fishery under measures like those in the proposed rule," which made it "only remotely possible that the measures succeed as required by the Magnuson-Stevens Act." AR 4617. According to EDF, "the current recreational management plan" made it "almost certain" that quota overages would continue, "potentially jeopardizing recent rebuilding of the red snapper stock." *Id.* EDF cited the same sections of the MSA as did Werner and Fish for America, along with 16 U.S.C. § 1853(a)(1)(A). *Id.*

Though the agency need not have received notice of precisely which causes of action Plaintiffs would eventually bring, the comments reveal that in fact NMFS did have explicit notice of Plaintiffs' claims under MSA Section 407(d), Section 303(a)(15), and National Standard 4. *See* 16 U.S.C. §§ 1883(d)(1) (requiring prohibition on the retention of fish), 1853(a)(15) (requiring accountability measures), 1851(a)(4) (requiring fair and

equitable allocation reasonably calculated to promote conservation).  The concern around *de facto* reallocation, expressed by all three commenters, also covers Plaintiffs' cause of action under MSA Section 304(b).  *See id.* § 1854(b)(1) (requiring consistency between FMP and management measures).[11]

### b.  Comments on the September Final Rule

Plaintiffs Guindon, Werner, and Waters (hereinafter "Guindon") submitted lengthy written comments on the September Final Rule.  Guindon's comment supported increasing the 2013 quota to 11 million pounds.  *See* AR 4989.  However, at the time Guindon submitted the comment, NMFS had not yet published its decision to reopen the recreational fishing season in fall 2013.  The comment made crystal clear that Guindon supported only "that portion of the proposed rule that would increase the 2013 total allowable catch to 11 million pounds."  *Id.*  Guindon remained concerned that the proposed rule "fail[ed] to include meaningful accountability measures for the recreational sector."  *Id.*  Guindon also reiterated that "[t]he lack of meaningful accountability measures for the recreational sector violates several provisions of the Magnuson-Stevens Act," and explained that further recreational overages would accomplish a "*de facto* reallocation from the commercial to the recreational sector that is inconsistent with the apportionment between those sectors as established by the Reef Fish FMP."  AR 4989-90.  Guindon insisted that "if the preliminary results [estimating June 2013 landings] prove accurate, the recreational sector should be required to pay back in 2014 any overage from 2013."  AR 4991.  In addition, though Guindon supported increasing the quota to 11 million pounds, the comment attacked the logic underpinning the Council's recommendation.  *Id.* at 4990-91.  Guindon explained that the gap between the ABC and

---

[11] Fish for America also explicitly cited this section in its comments.  *See* AR 4624.

the quota could not achieve "constant catch" while also serving as a "de facto buffer" against recreational overages, and asserted that such a "de facto buffer" would penalize the commercial sector, which has no overages. *Id.*

EDF also submitted comments on the September Final Rule, suggesting sector-specific buffers (which would mean a buffer on the recreational sector). AR 4984. EDF's comment again expressed skepticism that existing management measures would succeed, given the history of overages, and EDF again identified the MSA provisions that would be violated. AR 4985 (citing 16 U.S.C. §§ 1883(d), 1853(a)(15), 1853 (a)(1)(A), 1854(b)).

These comments gave NMFS sufficient notice of the issues underlying the present action.[12] Guindon's comments on the "constant catch" plan became the basis of Plaintiffs' claim that setting the quota at 11 million was arbitrary and capricious, in violation of the APA. *See* Compl. §§ 121-26. Guindon also revisited the issues raised in Werner's and Fish for America's comments on the May Final Rule. EDF echoed its earlier comments. Whether or not Plaintiffs (or a third party) were actually required to identify specific accountability measures that NMFS should adopt, the record reveals that commenters did so. *See* AR 4620 ("[t]he overage from the previous year is not deducted from the following year's quota; the enforcement and monitoring does not increase; the number of anglers is not capped"); AR 4623 (discussing payback provisions); AR 4984 (suggesting sector-specific buffers); AR 4991 (suggesting a payback provision for 2014).

---

[12] Without deciding whether a lawsuit on its own would provide sufficient notice to the agency, the Court observes that Plaintiffs filed this suit on June 26, 2013, and that the parties jointly moved for a stay on July 29, 2013, in recognition that Plaintiffs would likely amend their complaint to include the final rule NMFS planned to publish in September. *See* Dkt. #1, 21.

The only causes of action that are not directly addressed, with citations to the MSA, are Plaintiffs' causes of action under National Standards 1 and 2. However, National Standard 1 is a general obligation to "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1). To the extent that NMFS requires any notice at all with respect to its general responsibilities under National Standard 1, many of the commenters' objections could be fairly read as implying a violation of this standard. *See*, *e.g.*, AR 4617 (explaining that recreational overages "potentially jeopardiz[e] recent rebuilding of the red snapper stock").

As for National Standard 2, which requires NMFS to use "the best scientific information available," the commenters submitted their comments before NMFS decided to substitute the projected 2013 landings for the actual 2013 MRIP landings estimates. *See* AR 4989 (comments submitted August 29, 2013); AR 5014 (NMFS decision memorandum recommending approval of fall fishing season, dated September 10, 2013); 78 FR 57313 (September Final Rule, dated September 18, 2013). Plaintiffs were never given an opportunity to comment on NMFS's decision to designate the 2013 projections as the "best scientific information available," *see* 78 FR 57313, 57314, and thus cannot be retroactively required to have exhausted that issue during administrative proceedings.

### 5. Plaintiffs' Claims Fall Within the Scope of the MSA's Judicial Review Provision

The MSA provides that courts shall only set aside agency regulations "on a ground specified in section 706(2)(A), (B), (C), or (D) of [the APA]." 16 U.S.C. § 1855(f)(1)(B). CCA argues that insofar as Plaintiffs claim that NMFS should have adopted additional accountability measures, the judicial review provisions of the MSA preclude the Court from granting relief. *See* Defendant-Intervenor's Reply at 9. CCA

observes that Congress conspicuously omitted Section 706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). According to CCA, Congress intended this omission to foreclose plaintiffs from challenging "agency inaction." *See* Defendant-Intervenor's Reply at 9.

This novel argument finds no support in the case law. CCA has not identified any decision distinguishing between agency action and agency inaction in the MSA context.[13] In any event, the Court need not decide precisely what Congress intended to leave out of the MSA judicial review provision because Plaintiffs have alleged that three specific agency *actions* – the May Final Rule, June Temporary Rule, and September Final Rule – violated the MSA. If the Court finds any of those agency actions to be "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," *see* 5 U.S.C. § 706(2)(A), the MSA authorizes setting that action aside. *See* 16 U.S.C. §1855(f)(1)(B).

## B. Plaintiffs' MSA Challenges

### 1. NMFS Failed to Prohibit the Retention of Fish After the Recreational Quota Had Been Reached, in violation of Section 407(d)

Section 407(d) requires NMFS to "establish…quotas for recreational fishing…that, when reached, result in a prohibition on the retention of fish…for the remainder of the fishing year." 16 U.S.C. § 1883(d)(1). The Court has identified no cases applying this provision, nor do the parties put forth any particular interpretation of the phrase "result in a prohibition on the retention of fish," except as implied by their

---

[13] In several MSA cases, courts have actually included Section 706(1) when setting forth the APA standard of review, notwithstanding the excision of that section from 16 U.S.C. § 1855(f)(1)(B). *See, e.g., Texas v. Crabtree*, 948 F. Supp. 2d 676, 680 (S.D. Tex. 2013); *Connecticut v. Daley*, 53 F. Supp. 2d 147, 156 (D. Conn. 1999) *aff'd sub nom. Connecticut v. U.S. Dep't of Commerce*, 204 F.3d 413 (2d Cir. 2000).

arguments. The statute does not explain what methods of "prohibition" will satisfy the requirement, and the legislative history gives no indication.

The provision's first clause imposes on NMFS an obligation to "establish a quota," and the second clause essentially explains how the quota must function – *i.e.*, to "result in a prohibition on the retention of fish." *Id.* Thus, the Court concludes that under Section 407(d), NMFS must close the season, and may not reopen it, whenever the agency determines that the quota has been reached. The Court will also presume that NMFS has complied with the statute if it implements some effective mechanism to prohibit the retention of fish above the quota. This might include setting a season length in advance based on a projection of when the quota will be met, but such a projection must be accurate and conservative enough to effectively accomplish the statutory mandate.

Plaintiffs claim that NMFS violated Section 407(d) by approving a 28-day season based on a "flawed projection model," without adequate accountability measures, and by reopening the season in the fall when the recreational quota had already been reached and exceeded. Pls' Mot. at 14-15. NMFS contends that its method of complying with Section 407(d) was, and has been, to project when the quota will be met and set the length of the fishing season accordingly. Defs' Mot. at 28.

NMFS also argues that its decision to reopen the season in fall 2013 complied with Section 407(d) because the agency had concluded that there *was* additional quota available. *Id.* at 31. Despite the preliminary MRIP landings data from the June 2013 season, which indicated an overage of almost 2 million pounds, NMFS determined that the "best scientific information available" was the original projection used to set the

season length.  *Id.*  Under that projection, by definition, the amount of catch harvested in June 2013 exactly met the recreational quota of 4.145 million pounds.  According to NMFS, this justified reopening the season so that the recreational sector could capture its share of the quota increase.

The Court agrees with Plaintiffs that NMFS violated Section 407(d) in setting the June 2013 season, and in reopening the recreational fishing season in the fall.  If NMFS's estimates in previous years had come at all close to accurately predicting recreational landings, or if NMFS had some credible reason to believe that 2013 would be different, the Court might have been limited to sympathizing with Plaintiffs' frustrations at watching an agency fail to accomplish a statutory mandate.  But by 2013 at least, if not sooner, the agency had experienced many years of recreational overage, and possessed several remedial tools to effectuate its statutory responsibility.  At a certain point NMFS was obligated to acknowledge that its strategy of incrementally shortening the season was not working.  Administrative discretion is not a license to engage in Einstein's definition of folly – doing the same thing over and over again and expecting a different result.[14] Section 407(d) required NMFS to implement management measures with a fighting chance of "result[ing] in a prohibition on the retention of fish" – be that a buffer, a dramatically shortened season, or some other strategy.  Failing to do so was arbitrary and capricious.

---

[14] The Court need not specify the precise moment at which an agency's past failures to accomplish a statutory mandate make continuing with the status quo arbitrary and capricious.  The sufficiency of an agency's rationale depends on the "nature and context of the challenged action."  *Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs.*, 844 F. Supp. 770, 783 (D.D.C. 1993).  In this case, NMFS had experienced at least four years of extreme overages under its existing management scheme, and also had at its disposal several means to address those overages.

The agency's conduct in reopening the fishing season in fall 2013 was yet more egregious. To summarize the sequence of events: (1) in July 2013, the Council proposed increasing the 2013 quota and suggested reopening the season in the fall, contingent on there being unused quota available; (2) in early August, NMFS published a proposal discussing the possibility of reopening the season, contingent on available quota; (3) in late August, NMFS received MRIP landings estimates indicating an overage that exceeded both the current and proposed quota; (4) NMFS reopened the fall season anyway.

In July 2013, when the Council authorized reopening the season in the fall, it did so "contingent upon there being unused quota available," and observed that "[b]ecause of the potential for a quota overage during the June season, the full amount of a quota increase may not be available." AR 4786. The Council intended the length of the reopened season to be "based on the landings from the June season subtracted from the total recreational quota (original quota plus increase)." *Id.* In fact, the Council expected the break in time caused by the split season to "result in more accurate projections for 2013," because NMFS could "better determine how much quota is available before setting the closing date for the supplemental season." AR 4785. The Council also specifically noted in the July Framework Action that "the system for collecting recreational data has improved." AR 4785. All this suggests that the Council expected NMFS to use the June 2013 MRIP landings estimate, or at least some estimate based on recreational data from the 2013 season, when deciding whether to reopen.

In August 2013, NMFS proposed increasing the recreational quota from 4.145 to 5.39 million pounds, with a possible supplemental season contingent on the availability

of additional quota "after the June landings are known." 78 FR 49440, 49441. Then NMFS received the June landings estimate of 6.13 million pounds, which exceeded the quota then in effect by 2 million pounds, or about 48 percent. AR 5073. It also exceeded the proposed 5.39 million quota by over 700,000 pounds.

At that point the agency changed course. NMFS characterized the 48 percent overage as "unexpectedly high relative to previous years," AR 5073, though in the previous five years the average overage was 42 percent. *See* AR 3524.[15] OST was asked to explore the effect of sampling design on the MRIP landings estimates, but found no indication that the massive overage occurred as a result of those design changes. AR 5001. Despite OST's "inconclusive" finding, NMFS declared the 2013 MRIP landings estimates "non-comparable" to the 2013 quota. The agency then determined that, according to the "best scientific information available," the recreational sector caught exactly what the agency expected it would catch during the 28-day June season, *i.e.* 4.145 million pounds. AR 5003. This allowed NMFS to reopen the fishing season in the fall.

The agency's decision makes very little sense. NMFS decided to reopen the season without accounting in any way for the possibility that *some*, if not most or all, of the estimated overage was due to fishing effort. Assuming that the recreational sector caught exactly what the agency predicted it would, despite "more accurate" evidence of a massive overage – was a glaring dismissal of the "relevant factors," and a "clear error of

---

[15] This figure excludes the 2010 season, cut short by the Deep Water Horizon oil spill. Here the Court follows NMFS's lead. NMFS generally excludes data from the 2010 season when reviewing recreational sector landings, or otherwise treats that season as an aberration. *See* AR 2553 ("2010 data we did drop because of the oil spill and unusual fishing behavior that occurred in that particular year"); AR 4016 ("2010 was the only year without an overage as a result of decreased fishing because of the Deepwater Horizon MC252 oil spill"); AR 4364 (excluding 2010 data from red snapper landings summary).

judgment." *Flaherty*, 850 F. Supp. 2d at 47.  Under the APA standard articulated in *Flaherty* and other MSA cases, reopening the season was arbitrary and capricious.[16]

NMFS attempted to justify its action by explaining that "if the new MRIP methodology had been available to use in the 2013 stock assessment on which the current ABCs and quotas are based, then the original quotas may have been set much higher."  78 FR 57313, 57314.  In other words, NMFS disregarded the 2013 MRIP landings estimates not because they were inaccurate but because they raised the possibility that NMFS had set the prior quotas unnecessarily and unfairly low.  It is not clear to the Court why the possibility of unfairness in prior quotas, or even in a current quota, would justify disregarding accurate and reliable information.  NMFS never revised or disavowed those earlier quotas.  Instead it chose to adopt a landings estimate that it knew to be inaccurate, apparently to avoid punishing fishermen who might have been permitted to catch more under a hypothetical prior quota.

## 2. NMFS Failed to Use the Best Scientific Information Available, in violation of National Standard 2

NMFS's dismissal of the 2013 MRIP landings estimates also violated National Standard 2, which requires NMFS to base all conservation and management measures on the "best scientific information available."  16 U.S.C. § 1851(a)(2).  National Standard 2 obligates NMFS to make "a thorough review of all the relevant information available at the time."  *Ctr. for Biological Diversity*, 933 F. Supp. 2d at 148 (quoting *N.C. Fisheries Ass'n,* 518 F. Supp. 2d at 85).  NMFS may not "disregard superior data in reaching its conclusion."  *Id.*  Challenges brought under National Standard 2 will normally fail, unless

---

[16] The Court notes that in 2011, when faced with a similar situation, the agency acted more rationally. Additional quota had become available after the June 2011 season closed, but when preliminary estimates indicated that recreational landings in June had already exceeded the additional quota, NMFS declined to reopen the season in the fall.  *See* AR 4348.

there is "some indication that superior or contrary data was available and that the agency ignored such information." *N.C. Fisheries Ass'n,* 518 F. Supp. 2d at 85.

"Superior or contrary data" is precisely what NMFS ignored in promulgating the September Final Rule. NMFS conceded in the Rule itself that the June 2013 landings estimates were "more accurate and less biased than those produced in past years." AR 5073. Though NMFS insists that it never ignored that data, merely tabled it for further evaluation, the record demonstrates that the agency disregarded the estimate entirely in formulating the September Final Rule. Faced with reliable data as to how many fish were landed in the recreational sector, NMFS did not even factor the possibility of a massive overage into its decision to reopen the fall season.

NMFS scientists made clear that they could not attribute the "unexpectedly high"[17] landings to differences in sampling methodology. *See* AR 5001. Even the Director of NMFS's Southeast Fisheries Science Center, who originally deemed the 2013 MRIP estimates "non-comparable," still recognized the uncertainty concerning what was actually caught in June 2013 and recommended that such uncertainty "should be factored into decisions about season length for the fall season." AR 5003. NMFS nevertheless reopened the season, as if there remained any possibility that the recreational sector had actually landed only 4.145 million pounds of red snapper. This is a quintessential example of ignoring "superior or contrary data." *N.C. Fisheries Ass'n,* 518 F. Supp. 2d at 85.[18]

---

[17] The Court questions whether landings representing a 48 percent overage can fairly be characterized as "unexpectedly high" in light of the similar overages in recent years.

[18] NMFS did revise its estimate of fall catch rates upward from 50 percent to 75 percent of summer catch rates, but as the agency acknowledged, this was primarily in response to public comment from fishermen evincing enthusiastic plans to fish again in the fall. *See* AR 5011-12. The agency's cryptic reference to "questions about the new data," AR 5012, hardly constitutes a "thorough review" of the available information. *See Ctr. for Biological Diversity*, 933 F. Supp. 2d at 148. National Standard 2 would

*Center for Biological Diversity* offers an illustrative counterpoint to NMFS's actions in this case. In *Center for Biological Diversity*, the plaintiff claimed that NMFS violated National Standard 2 by failing to consider an alternative model for estimating fish population. 933 F. Supp. 2d at 148. Noting that the alternative model "was not even finalized at the time," the court described the plaintiff's argument as "border[ing] on the frivolous," but the court also asserted that "even if the full results of the…model had been available at the time, it is well established that NMFS 'may choose' between 'conflicting facts and opinions,' so long as it 'justif[ies] the choice.'" *Id.* at 149 (quoting *Fishermen's Finest, Inc. v. Locke,* 593 F.3d 886, 890 (9th Cir. 2010). The court cautioned that "the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed." *Id.* at 150 (internal quotation omitted). For these reasons, the Court upheld NFMS's actions as within the bounds of the agency's discretion, and not violative of National Standard 2. *Id.*

In this case, the landings estimate was complete, *i.e.* "available" to NMFS before the agency decided to designate something else as the "best scientific information available." *See* AR 5011. This was not a matter of selecting between competitive statistical models. NMFS disregarded the actual landings estimate in favor of a projection that the agency knew (with near certainty) was inaccurate. That is a far cry from the agency's actions in *Center for Biological Diversity*, or other cases in which NMFS rules withstood challenges under National Standard 2. *See*, *e.g.*, *Flaherty*, 850 F.

---

logically require the agency to consider (1) the conflict between the estimate the agency proposed to adopt, 4.145 million pounds, and the actual estimated landings of 6.13 million pounds, and (2) the possibility that, in light of the 2 million pound overage, the model used to calculate the summer catch rate (from which the agency proposed to derive the fall catch rate) might itself contain flawed assumptions about fishing effort.

Supp. 2d at 61-62 (upholding selection of a three-year annual average figure to estimate recent catch, where plaintiffs identified no "superior or contrary data" and the regional council gave four rationales, including fishing industry custom, an anomaly in the most recent single year, and creation of a buffer); *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 158 (D.D.C. 2005) *aff'd sub nom. Oceana, Inc. v. Gutierrez*, 488 F.3d 1020 (D.C. Cir. 2007) (upholding NMFS's decision to consider "not only its own data, but also other studies, expert opinions, and considerations raised by the public at large"); *Van Valin v. Locke*, 671 F. Supp. 2d 1, 13 (D.D.C. 2009) (upholding NMFS's decision to disregard recent participation data in setting a bag limit, where incorporating the data would allow certain fishermen to profit from the overfishing that the regulation was intended to combat).

Of course NMFS may decline to use information it deems inconclusive or irrelevant.[19] NMFS may also designate its own projections as the best available scientific information, where circumstances warrant.[20] This case, the Court trusts, is a rare instance of an agency disregarding accurate and reliable data to avoid penalizing recreational fishermen. National Standard 2 requires at minimum that reliable data be treated as such.

### 3. NMFS Failed to Require Adequate Accountability Measures, in violation of Section 303(a)(15)

Section 303(a)(15) provides that every FMP must "establish a mechanism for specifying annual catch limits in…implementing regulations…at a level such that

---

[19] As the cases establish, NMFS may also choose to rely on incomplete or imperfect information. *See N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 85 ("It is well settled—and both applicable regulations and consistent case law confirm—that the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed."); *Center for Biological Diversity*, 993 F. Supp. 2d at 150 (same).

[20] For example, if some factor corrupted landings estimates in such a way that they became useless, or if an unusual event (such as the oil spill) skewed the data irretrievably, the agency's projections – adjusted as necessary – might offer the best estimate of landings during that time.

overfishing does not occur in the fishery, including measures to ensure accountability."
16 U.S.C. § 1853(a)(15). Plaintiffs argue that NMFS's failure to require any
accountability measures violated Section 303(a)(15). Pls' Mot. at 22. NMFS insists that
the agency already uses the accountability measure of in-season closure, and only the
Council can approve post-season accountability measures. Defs' Mot. at 34.[21]

At the outset, the Court recognizes that Section 303(a)(15) is phrased in terms of
what an FMP must contain, namely, "measures to ensure accountability," not in terms of
what every regulation or proposed regulation must contain. *See* 16 U.S.C. § 1853(a)(15).
This gives NMFS's argument some surface appeal, in that the responsibility to revise the
FMP lies primarily with the Council. However, if the FMP does not contain adequate
AMs, either because of an error in judgment at the outset or because changing
circumstances require additional AMs, NMFS is not left helpless, with hands tied, hoping
that the Council will eventually correct the omission. The statute and the agency's own
guidelines make abundantly clear that AMs can and should be used to address
management uncertainty. NMFS must disapprove and return for revision any Council
proposal that does not contain adequate AMs. The agency cannot excuse its obligation
by arguing that only the Council can authorize an AM. If the Council fails to propose a
necessary AM, or, as in this case, explicitly rejects an AM over the recommendation of
its SSC, NMFS must fulfill its statutory responsibility as a backstop.

---

[21] NMFS also argues that Plaintiffs' challenge under Section 303(a)(15) is time-barred, Defs' Mot. at 26, because the most recent FMP amendment occurred in 2010 and plaintiffs must bring suit within 30 days. *See* 16 U.S.C. § 1855(f)(1). Plaintiffs respond, correctly, that they timely filed a challenge to three NMFS rules published in 2013, and that their Section 303(a)(15) claim alleges that NMFS failed to perform its statutory duty when it approved those three rules without requiring adequate AMs. Pls' Mot. at 9. Whether NMFS has such a statutory duty is a separate question, but Plaintiffs' challenge is directed at the agency's 2013 rules, not at the 2010 FMP Amendment. As such, Plaintiffs' claim is timely.

The question then becomes whether some additional AM was necessary in this case. As the court recognized in *Oceana, Inc. v. Locke*, "[t]he MSA does not elaborate on what constitutes 'measures to ensure accountability' with ACLs under § [303(a)(15)]." 831 F. Supp. 2d 95, 116 (D.D.C. 2011). However, the guidelines issued by the Secretary, codified at 50 C.F.R. § 600.310, help flesh out the concept of accountability measures. Those guidelines are entitled to deference. *See Oceana, Inc. v. Locke*, 831 F. Supp. 2d at 116 (citing *Natural Resources Def. Council, Inc. v. Daley,* 209 F.3d 747, 752–53 (D.C. Cir. 2000) ("Courts must defer to an agency's reasonable interpretation of ambiguous provisions in a statute it administers…in accordance with the analytical framework established by the Supreme Court in *Chevron*").

The Court in *Oceana v. Locke* correctly concluded that NMFS guidelines interpreting the MSA are not entitled to automatic *Chevron* deference, because "they do not carry the force of law." *Id.*; *see also* 16 U.S.C. § 1851 ("The Secretary shall establish advisory guidelines (which shall not have the force and effect of law)"). However, the guidelines are entitled to "considerable deference" in light of their thoroughness, the agency's expertise, and the administrative formalities involved in their promulgation. *See Oceana v. Locke*, 831 F. Supp. 2d at 117; *United States v. Mead Corp.,* 533 U.S. 218, 228 (2001) (assessing "the degree of the agency's care, its consistency, formality, and relative expertness, and…the persuasiveness of the agency's position").

According to the NMFS guidelines, accountability measures "should address and minimize both the frequency and magnitude of overages and correct the problems that caused the overage in as short a time as possible." 50 C.F.R. § 600.310(g)(1). Where overages occur, "AMs must be triggered and implemented as soon as possible to correct

the operational issue that caused the ACL overage, as well as any biological consequences to the stock or stock complex resulting from the overage when it is known." *Id.* § 600.310(g)(3). Finally, "if the management measures for different sectors differ in the degree of management uncertainty, then sector ACLs may be necessary so that appropriate AMs can be developed for each sector." *Id.* § 600.310(f)(5)(ii).

*Oceana v. Locke* offers a pertinent example of the standard that NMFS must meet under Section 303(a)(15). The plaintiff in that case claimed that NMFS had failed to implement adequate accountability measures for five species in a fishery. 831 F. Supp. 2d at 114. NMFS had allocated all the catch for those five species to so-called "common-pool" vessels, with no catch allocated to vessels that fished under a permit. *Id.* at 115. Though there were accountability measures for the common-pool segment, there were no accountability measures for the permitted vessels. *Id.* NMFS argued that because permitted vessels were prohibited from harvesting any of those five species, specific accountability measures were unnecessary. *Id.* The plaintiffs responded that bycatch (the catching of fish not targeted by the fisherman) would still occur, and could in fact cause an overage, thus requiring specific accountability measures for permitted vessels. *Id.* at 115-16.

The court in *Oceana v. Locke* concluded that the guidelines "clearly favor" establishment of sector-specific AMs whenever there are sector-specific ACLs. *Id.* at 117. But specific AMs were not mandatory so long as NMFS implemented sufficient overall AMs to prevent overfishing. *Id.* (citing 50 C.F.R. § 600.310(f)(5)(ii)). The overall AMs in place in that fishery were not sufficient to protect those five species. *Id.* at 118. Even prohibiting the retention of the five species was not enough, because

without specific AMs the permitted vessels could catch the five species as bycatch "with impunity, and in doing so, cause their continued overfishing." *Id.* at 120. The court reached its conclusion while recognizing that under normal circumstances deference to NMFS is "especially appropriate" in highly technical decisions. *Id.* (quoting *Nat'l Fisheries Inst., Inc. v. Mosbacher,* 732 F. Supp. 210, 223 (D.D.C. 1990)). But in that case, NMFS had failed to "articulate a rational connection between the facts found and the choice made." *Id.* (quoting *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105 (1983).

If anything, the instant case presents an even more striking disconnect between the agency's decision and the facts before it. The administrative record is replete with references to the high degree of management uncertainty in the recreational sector, as compared to the commercial sector, which had none. *See* AR 4349 ("the recreational quota has regularly been exceeded"); AR 4384 ("A buffer for the commercial sector is not believed to be necessary because the commercial sector has not exceeded its quota since implementation of the IFQ program in 2007…the purpose of the recreational buffer is to address management uncertainty and reduce the likelihood that the recreational sector would exceed its quota"); AR 4724 ("Considerable uncertainty exists in projecting season estimates given variability in average weights, catch per day, and implementation of incompatible state regulations").

NMFS administrator Roy Crabtree described the recreational sector's particular management uncertainties to the Council's Reef Fish Management Committee in January 2013, and to the full Council in June 2013. *See* AR 2542 ("If you look at the performance of the fishery in the past, we have, more often than not, had overages in the

range of a million pounds...We still have a lot of management uncertainty in this fishery in terms of our ability to close the fisheries on time in the recreational sector"); AR 3930 ("There's been a great deal of management uncertainty and that's reflected in the quota overruns to the recreational sector…We all know there's a great deal of uncertainty inherent in determining when to close the recreational fishery and what they're ultimately going to catch…There is a need for a buffer that reflects management uncertainty, because there is certainly management uncertainty in the recreational fishery").

All this evidence of high management uncertainty explains why the SSC recommended a 20 percent buffer for the recreational sector.  AR 4778.  The Council well understood this.  In the July Framework Action, the Council discussed the SSC's buffer recommendation as one possible alternative, explaining that buffers "would be applied separately to the recreational and commercial sectors because there is a different level of management uncertainty between the sectors."  AR 4784.  Specifically, the commercial buffer would be 0 percent "because the sector is under an IFQ program, has accurate landings data, and has not exceeded its quota in the last four years," but the recreational buffer would be 20 percent "primarily because of the quota overages in three of the past four years."  *Id.*

Yet the Council rejected the buffer, while proposing no other accountability measures for the recreational sector, and NMFS approved the Council's proposal.[22]  The agency did so though it evidently comprehended the degree of management uncertainty in the

---

[22] The Council did explain that its decision to set the quota at 11 million, rather than 13.5 million, would act as a "de facto buffer" against recreational overages.  AR 4785.  Perhaps this could be construed as an accountability measure, but it was not a sector-specific accountability measure.  The guidelines "clearly favor" sector-specific AMs, *Oceana v. Locke*, 831 F. Supp. 2d at 117, because as this case demonstrates, imposing a restriction on an entire fishery to accommodate management uncertainty in one sector may penalize fishermen in another.

recreational sector, or at least recognized the "known unknowns" associated with managing that sector.[23] As the court explained in *Oceana v. Locke*, NMFS's guidelines "clearly favor" the establishment of sector-specific accountability measures where management uncertainty differs between sectors. 831 F. Supp. 2d at 117; *see also* 50 C.F.R. § 600.310(f)(5)(ii) (explaining that sector-specific ACLs allow development of "appropriate AMs…for each sector"). The single accountability measure included in the FMP, in-season closure, has done very little to prevent quota overages. Given management uncertainties, the agency's approval of a 28-day season, and the decision to reopen the season in the fall, with no additional AMs, effectively allowed the recreational sector to overharvest red snapper "with impunity." *Id.* at 120. Such a dogged belief that somehow 2013 would be different than previous years defies logic. The Court acknowledges the deference customarily owed when an agency utilizes its scientific expertise, but in this instance NMFS has not "articulate[d] a rational connection between the facts found and the choice made." *Baltimore Gas and Elec. Co.,* 462 U.S. at 105.

This Court will not dictate precisely which accountability measures NMFS should have required, or should require in the future. That decision is best left to the expertise and discretion of the agency tasked with carrying out the statute. NMFS need not implement so many accountability measures that overharvesting and overfishing become utterly beyond possibility. That reads too much into the MSA. However, Section 303(a)(15) would lose all teeth and coherence if NMFS, faced with persistent overages and high management uncertainty, could claim compliance by simply identifying any control that technically qualifies as an "accountability measure." In this case, it is

---

[23] See *Citizens for Responsibility & Ethics in Washington v. Dep't of Educ.*, 538 F. Supp. 2d 24, 30 (D.D.C. 2008) (describing "known unknowns"); *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).

apparent from the record that the existing scheme does not "ensure accountability" within the meaning of Section 303(a)(15).

### 4. NMFS Has Effectively Reallocated Catch from Commercial to Recreational Sector, in violation of Section 304(b) and National Standard 4

Section 304(b) of the MSA requires consistency between the FMP and implementing regulations. *See* 16 U.S.C. § 1854(b). Plaintiffs argue that NMFS violated Section 304(b) by creating a "de facto reallocation" of quota from the commercial to the recreational sector, such that the actual allocation of quota did not reflect the 51/49 split established in the FMP. *See* Pls' Mot. at 30. NMFS contests Plaintiffs' statement that the agency has accomplished a "*de facto* reallocation," emphasizing the agency's shortening of the fishing season in recent years. Defs' Mot. at 37.

NMFS seems to argue that as long as the 51/49 split remained on paper, and the agency did *something* to carry it out, there could not be a "de facto reallocation." The Court views this contention with some skepticism. But even accepting NMFS's view, the agency's decision to reopen the fall season despite reliable evidence that the sector had already exceeded its quota overtly contravened the terms of the FMP. NMFS essentially guaranteed that the actual catch allocation would skew widely from the 51/49 allocation, as indeed it did. This violated Section 304(b).

Plaintiffs also claim that the "de facto reallocation" runs afoul of National Standard 4, which provides that allocation of fishing privileges must be fair and equitable to all fishermen, and reasonably calculated to promote conservation. *See* 16 U.S.C. § 1851(a)(4). NMFS maintains that rules can have a disparate effect on fishing sectors while remaining "fair and equitable" within the meaning of the statute. Def's Mot. at 3.

The Court need not investigate NMFS's interpretation of the "fair and equitable" provision, because the agency's actions ran counter to the second prong of National Standard 4. When an agency blinds itself to the high likelihood that its actions will cause overharvesting, the Court cannot characterize those actions as "reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4). For that reason, the September Rule, at least, violates National Standard 4.

### C. Plaintiffs' NEPA Claim

Plaintiffs seek no relief under NEPA that differs in any way from the relief sought under the MSA. *See* Compl. at 34. In light of the Court's decision to vacate the May, June, and September Final Rules, the Court need not decide Plaintiffs' NEPA claims at this time. *See Natural Res. Def. Council, Inc.*, 209 F.3d at 749 (finding "no need to reach appellants' NEPA claims" where court remanded a rule to NMFS).

## IV. CONCLUSION

For the reasons given above, the Court finds that the May Final Rule, June Temporary Rule, and September Final Rule were arbitrary and capricious and not in accordance with the MSA. Under the MSA, NMFS has a statutory duty to: prohibit the retention of fish after quotas are reached in the Gulf of Mexico red snapper fishery; use the best scientific information available when making management decisions; require whatever accountability measures are necessary to constrain catch to the quota; avoid decisions that directly conflict with the FMP's allocation of catch; and, where sectors are managed separately, avoid penalizing one sector for overages that occur only in another.

March 26, 2014

BARBARA J.  ROTHSTEIN
UNITED STATES DISTRICT JUDGE